# Pennsylvania Labor Relations Board v. Everly

*T. McKeen Chidsey*, Attorney General, *M. Louise Rutherford*, Deputy Attorney General, and *George L. Reed*, solicitor, for Pennsylvania Labor Relations Board.

*William J. Kearney* and *John R. Lenahan*, for petitioner.

HOBAN, P. J., February 11, 1948.—This case involves a petition for review of a decision and order of the Pennsylvania Labor Relations Board and a cross petition filed by the board for an order of enforcement. The board made a number of findings of fact, generally to the effect that Everly, an employer, attempted to re-

strain and coerce his employes in the exercise of their rights to join a union, and that Everly specifically discriminated against a supervisory employe, Robert Sanders, and discharged him for union activities and for the purpose of discouraging membership in the union. An order of the board directed Everly to cease and desist from interfering with, restraining and coercing his employes in their right to join the union, and cease and desist from discriminating against his employes in regard to tenure of employment because of their union membership or activities, and to take affirmative action to restore Robert Sanders to his job without prejudice and to pay him back wages he would have earned had he not been discharged, together with a directive to the employer to post copies of the decision and order on his premises and furnish evidence to the board of compliance.

From the records the facts appear to be as follows:

Spencer Everly, an individual, acquired an office building in the City of Scranton known as Scranton Real Estate Building, in June 1946. The building contains some 90 rooms and there were 32 or more tenants. At the time he acquired the building, Everly found six employes there, four men and two women. One of the men, Robert Sanders, was the superintendent of the building and had the right to hire and discharge and to direct the work of the other employes. Sanders also acted as a general handy man and maintenance man for the building. The other male employes consisted of two elevator operators, who worked on different shifts, and a fireman. The two women employes were charwomen and worked habitually from five o'clock in the evening of business days until such time as their cleaning duties were completed.

A month after he took over the building Everly increased everybody's wages. During the course of the summer Everly, who in addition to his ownership of this building was also in the grocery business and

other enterprises, provided the employes of the Scranton Real Estate Building with gifts of butter and other groceries and at Thanksgiving time furnished all the employes with turkeys. In the fall of 1946 the United Building Service Employes Union, an affiliate of the Retail, Wholesale and Department Store Employes Union, in turn affiliated with the Congress of Industrial Organizations, began an effort to unionize the employes in Scranton Real Estate Building. Several of the male members, including Sanders, the building superintendent, joined the union as of November 1, 1946. The business agent of the union had some conversations with Everly about representation. At Christmas time Everly proposed to grant money bonuses to his employes and did so after a consultation with McNulty, the business agent of the union.

The union began a representation proceeding, which so proceeded that a hearing was held on January 3, 1947. See proceedings to no. 210, year 1946, Pa. L. R. B. As a result of that hearing an election was held on February 4, 1947, to determine whether this union would be the bargaining agent for the building employes. Because he was listed as a supervisory employe, Sanders was prohibited from voting, although a member of the union, and in the election the union was defeated by a vote of three to two. On February 15, 1947, Everly again raised the wages of all employes except Sanders, making the increases retroactive to February 1, 1947. On February 28, 1947, Everly discharged Sanders from further employment, his notice of discharge simply stating that his services would be no longer required.

Everly was openly hostile to the establishment of the union as a bargaining agent for his building employes. He stated on a number of occasions to employes that he did not see the necessity for a union and that he did not want any third party coming between him and his employes. With one of them in particular,

Otto Berry, an elevator operator, he had some extended conversation on the subject, once just before Christmas in 1946, when he gave Berry a ride to Berry's home in his automobile and told him that he could not see any necessity for a union and that he himself could do better for his employes than the union could. He also offered and the next day delivered to Berry a second-hand suit of clothes for which he, Everly, no longer had any use. Berry reported the conversation and its purport to other employes of the building. Prior to the election of February 4th there was another conversation with Berry in which he asked Berry to vote against the union. There is evidence also of conversations with William Kern, fireman, and that just prior to the election Everly expressed surprise to Sanders that Sanders had joined the union. At that time he told Sanders that he expected to give the employes more money and a hospitalization plan. After the election Everly called Sanders into his office and used the expression, "Well, we won and you lost", indicating that the employer had won in the controversy as to representation.

Sanders' rate of pay when Everly took over the building was $88 a month. He put in extra time as a relief man for some of the other employes, for which he was paid on an hourly basis, so that his monthly earnings ran generally about $110.40. In his reorganization of the building Everly told Sanders that he would pay him at the regular rate of $110 a month, for which he would be expected to do his regular work and fill in extra shifts when one of the other employes was off, but there was no arrangement for extra pay for such additional shift.

As a result of losing the election, on February 14, 1947, the union, through its regional director, filed with the board a charge of unfair practices, and on February 24th the board issued a formal complaint and directed a hearing to be held on the matter on March 11, 1947. As noted before, Sanders was dis-

charged on February 28th. A hearing was duly held by an examiner for the board on March 11th and up to that time at least Sanders had not been replaced as superintendent of the building, nor had anyone been hired in his place to perform his other duties. There is some evidence that Berry and Kern had been asked to find one, or possibly two, men to do additional labor work in the building, and Everly himself admitted he would need some additional workers, but that he did not desire any supervision, which he proposed to furnish himself. His stated reason for discharging Sanders is that the employment of Sanders as a supervisor was not justified by the income from the building and that he was doing at the time, and proposed to do in the future, all of the supervising necessary.

The board concluded that the total course of conduct outlined generally as above constituted an effort by Everly to interfere with and restrain and coerce his employes in the exercise of their right to self-organization, and to join the labor union and to bargain collectively through their own representative. And further, that the evidence discloses that Sanders was discharged from employment because of his known membership in, association with, and activities on behalf of, the union and for the purpose of discouraging membership in the union.

If these conclusions were warranted from the evidence, it is quite clear that the board was authorized under the law to issue the order which it did. The question which must be considered by this court on review and upon consideration of the petition for enforcement is whether or not there is substantial and legally credible evidence to support these findings.

In our opinion there is no evidence of any sort, substantial or otherwise, which can be considered legally credible and in support of these findings.

It is obvious that Everly, the employer, did not want the union, was open and frank in his expression to his

employes that he did not want a union, that he could not see its necessity, and that he attempted to persuade them to vote against the union's effort to become the sole collective bargaining representative for his building employes. But, unless we are to say that the first and fourteenth amendments to the Constitution of the United States are ineffective, the employer has as much right to express his opinion on the merits of unionization and to make his opinions known to his employes as the employes would have to make their opinions known to him, or to persuade him to accept a specific union as their bargaining agent. What he must not do is to interfere with, restrain or coerce his employes in the exercise of their rights, nor to discriminate against them in regard to hire or tenure of employment because of a union activity and so discourage membership in any labor organization. This is a far different matter than the expression of opinion, or even an effort to persuade by reason his employes to a course of action which the employer believes to be to his own interest. It is recognized that sharp distinctions may have to be drawn between the legitimate exercise by the employer of his own right of free speech to his employes and effective coercion or restraint by threats of economic reprisals. Nevertheless, there is such a distinction, and tribunals, both administrative and judicial, must of necessity draw them in analyzing evidence and reaching findings of fact.

Essentially, the question here is as to whether or not the evidence supports a finding that the employer's conduct in this case amounted to coercion and discrimination rather than to the legitimate exercise of free speech and a legitimate discharge of an employe he considers no longer necessary for economic reasons and to whom he is not bound by any contract, either individual or collective. In the latter situation it is unnecessary to consider whether or not any individual con-

tract existed between Sanders and the employer, as, if there was such contract, his remedy is in another proceeding. It is obvious that there was no collective bargaining contract establishing any right to tenure of employment.

If the board is justified in holding that there was interference, restraint or coercion by employer against his employes to prevent their organization or selection of a collective bargaining agent, or discrimination against Sanders as to his employment because of his union membership, the evidence to that effect must be substantial and legally credible. The evidence must be sufficient to convince a reasonable mind to a fair degree of certainty, "otherwise our vaunted system of justice would rest upon nothing higher than arbitrary edicts of its administrators. 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion': Consolidated Edison Co. v. National Labor Relations Board, 305 U. S. 197, 229." The evidence " 'must do more than create a suspicion of the existence of the fact to be established': National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U. S. 292, 300." These cases were cited as authority in the late Pennsylvania case of Pennsylvania Labor Relations Board v. Kaufman Dept. Stores, Inc., 345 Pa. 398.

Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify, if the trial were by a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. Suspicion cannot be substituted for evidence in a hearing before the Pennsylvania Labor Relations Board: Union Trust Co. of Pittsburgh's Petition, 342 Pa. 456.

In this case we are faced with the difficult proposition of determining mental intention or motive of an

individual, but the difficulty of such determination does not warrant us in making it without evidence. Mental state may be shown in various ways, by evidence of action, of contempt and disregard, of disparagement, of active and continued discrimination, and as pointed out in many of the cases, the whole pattern of activity may be built up on the part of an employer which when viewed as a whole can lead to no other conclusion but that the employer's activities are intended to interfere with, restrain or coerce employes. But can the actions in this case, viewed in any light, lead to such a conclusion as a matter of reason? We think not. The employer's actions here are as equally explainable by his personal desire to deal directly with his employes in a simple enterprise, and his dislike of an intermediary, which desire and dislike may be natural under the circumstances and the expression of which is certainly not unlawful, but there is absolutely not one single word or act from which can be derived an intention to penalize or discriminaate against any of the employes because of their union activity or membership. Expressions of disappointment at an employe's attitude, or of satisfaction at the union's defeat in an election cannot by themselves lead to these conclusions, and the sum total of the evidence amounts to just those two things.

As to the alleged discrimination against Sanders, the principle expressed in Pennsylvania Labor Relations Board v. Kaufman, supra, is applicable. Where an employer gives a lawful, normal and readily comprehensible reason for the discharge of an employe, the burden is upon the employe, his union or the board to prove by substantial legally credible evidence that the real motive of the employer was an improper one and that the discharge of the employe constituted, directly or indirectly, an unfair labor practice within the meaning of the act. See also Union Trust Co. of Pittsburgh's Petition, 342 Pa. 456, and Martel Mills

Corp. v. National Labor Relations Board, 114 F.(2d) 624 (C. C. A., 4). As was said in the Union Trust Co. of Pittsburgh's Petition, supra, there is no evidence here which permits of the inferences upon which the board must depend for its conclusion. In the absence of such evidence, the findings of the board must be set aside and its order vacated.

In arriving at our decision, we have considered only the question as to whether there is substantial legally credible evidence to support the findings of fact and conclusions of the board. Since upon the points at issue we think there is not such evidence, we will direct that the board's order be vacated. However, it is appropriate to note that both parties concede that a supervisory employe in his relation to his employer is an employe, while in his relation to those working under him he is a representative of the employer and within the definition of employer contained in the act. (NLRB v. Skinner & Kennedy Stationery Co., 113 F.(2d) 667.) We have not considered in this decision the question as to whether an employer can be compelled in any event to restore a supervisory employer to his employ. It may be that because of the relation of confidence between the employer and the supervisor, which does not usually exist between the employer and the production employe, a supervisor unjustly discharged for union activities might have to find his remedy in money damages rather than restoration to work. The supervisory employe is barred from participating in a representation election on the ground that his interests are those of the employer. If his interests are supposed to be those of the employer, how then can the employer be compelled to retain him in his employ when in the employer's opinion his interests have ceased to be those of the employer? Whether the employer's decision on that point is reasonable or just has nothing to do with the case. The point is that no person can very well be compelled to retain in a posi-

tion of confidence a person in whom he has no longer any confidence. The peculiar relationship of employer to supervisory employe may indicate that enforcement of a remedy for discrimination against a supervisory employe must exclude the possibility of restoration to his position against the employer's will.

Now, February 11, 1948, the final decision of the Pennsylvania Labor Relations Board, dated September 12, 1947, dismissing the exceptions filed by the employer to the decree nisi of the said board in case no. 30, year 1947, is set aside. The exceptions to the decree nisi are sustained, the findings and conclusions therein excepted to are vacated, and the order of the board, dated June 30, 1947, reversed. The petition for enforcement of the order of the Pennsylvania Labor Relations Board is dismissed.