## NATIONAL LABOR RELATIONS BOARD *v.* COLUMBIAN ENAMELING & STAMPING CO.

No. 229. Argued January 11, 12, 1939.—Decided February 27, 1939.

*Mr. Robert B. Watts,* with whom *Solicitor General Jackson,* and *Messrs. Charles A. Horsky, Charles Fahy, Laurence A. Knapp,* and *Mortimer B. Wolf* were on the brief, for petitioner.

*Mr. Earl F. Reed,* with whom *Messrs. Otto A. Jaburek* and *Charles M. Shorp, Jr.* were on the brief, for Columbian Enameling & Stamping Co., and *Mr. Paul R. Shafer* for Hiatt et al., respondents.

MR. JUSTICE STONE delivered the opinion of the Court.

This petition tests the validity of an order of the National Labor Relations Board of February 14, 1936, directing respondent to discharge from its service employees who were not employed by it on July 22, 1935; to reinstate, to the vacancies so created, those who were employed on that date and have not since received substantially equivalent employment elsewhere; and to desist from refusing to bargain collectively with Enameling and Stamping Mill Employees Union No. 19694 as the exclusive representative of respondent's production employees with respect to rates of pay, wages, hours, and other conditions of employment. Unless the finding of the Board that respondent had refused to bargain collectively with the Union on July 23, 1935, is sustained by the evidence, the order is invalid.

Pursuant to a charge lodged with it by the Union, the Board issued its complaint charging respondent with un-

fair labor practices affecting interstate commerce within the meaning of § 8 (1) and (5) of the National Labor Relations Act. 49 Stat. 449. After hearing, the Board made findings which, so far as now relevant, may be summarized as follows: Respondent corporation is engaged at Terre Haute, Indiana, in the manufacture and sale in interstate commerce of metal utensils and other products. On July 14, 1934, respondent and the Union entered into a written contract for one year, terminable on thirty days' notice, prescribing various conditions of employment. It provided that no employee should be discriminated against by reason of membership or non-membership in, or affiliation or non-affiliation with any union or labor organization. It also provided for arbitration, before an arbitration committee, of disputes arising under the contract, and that "There shall be no stoppage of work by either party to this contract, pending decision by the Committee of Arbitration."

Between the date of the signing of the agreement, July 14, 1934, and March 23, 1935, respondent's officers held numerous meetings with representatives of the Union, usually the Union Scale Committee, for the consideration and adjustment of various demands of the Union. At a meeting on January 4, 1935, the committee presented a number of requests, among them the demand that respondent should discharge any employees who might be suspended by the Union. This and the other demands were rejected by respondent, and a later request that the demands of January 4th be arbitrated was likewise refused on the ground that they were not arbitrable under the agreement. The committee afterward presented new demands at other meetings and then at a meeting on March 11th renewed the demands of January 4th, which respondent again rejected. On March 17th the Union passed resolutions reciting grievances and demanding a closed shop, and on March 23rd ordered a

strike, when four hundred and fifty of respondent's five hundred employees left work. On March 30th respondent announced that its factory was closed indefinitely.

The strike was in effect July 5, 1935, when the National Labor Relations Act was approved, and continued until about July 23rd, when respondent resumed operations at its plant. By August 19th it had received three thousand applications for employment and had reëmployed one hundred and ninety of its production employees. By the end of the second week in September respondent had employed a full force. On July 23rd two labor conciliators from the Department of Labor appeared in Terre Haute and were requested by the Union "to try and open up negotiations with the respondent." On that day the conciliators met and conferred with respondent's president, who agreed to meet them with the Scale Committee. Several days later he informed them that he would not meet with them or with the Scale Committee. Later respondent received, but did not answer, letters of the Union of September 20th and October 11th, asking for a meeting to settle the controversy between them.

The Board concluded that on July 23rd the "union represented a majority of the respondent's employees, that it sought to bargain with the respondent, that the respondent refused to so bargain, and that this constituted an unfair labor practice" within the meaning of § 8, subdivision (5) of the Act. It ordered respondent to discharge all of its production employees who were not employed by it on July 22, 1935, to reinstate its employees as of that date, and thereupon to desist from refusing to bargain with the Union as the exclusive representative of respondent's production employees.

Application by the Board for a decree enforcing its order was denied by the Circuit Court of Appeals for the Seventh Circuit, 96 F. 2d 948, on the ground that as

the employees had struck before the enactment of the National Labor Relations Act, in violation of their contract not to strike and to submit differences to arbitration, they did not retain and were not entitled to protection of their status as employees under § 2 (3) of the Act. We granted certiorari, 305 U. S. 583, the questions presented with respect to the administration of the National Labor Relations Act being of public importance.

The Board's order is without support unless the date of the refusal to bargain collectively be fixed as July 23, 1935. The evidence and findings leave no doubt that later, in September, respondent ignored the Union's request for collective bargaining, but as at that time respondent's factory had been reopened and was operating with a full complement of production employees, the refusal to bargain could afford no basis for an order by the Board directing, as of that date, the discharge of new employees and their replacement by strikers. Restoration of the strikers to their employment, by order of the Board, under § 10 (c) of the Act, could as a practical matter be effected only if respondent had failed in its statutory duty to bargain collectively at some time after the approval of the National Labor Relations Act on July 5th, and before respondent had resumed normal operation of its factory. The date fixed by the Board was July 23rd, when respondent reopened its factory, and the occasion was the personal interview on that day and a later telephone conversation of respondent's president with the conciliators from the Labor Department, who were not members or official representatives of the Union and who, so far as the testimony discloses, did not then appear to the president to be authorized to speak for the Union.

In appraising these transactions between the conciliators and respondent's president, it is important to bear

in mind the nature and extent of the legal duty imposed upon the employer by the National Labor Relations Act. Section 8 (5) declares that it is an "unfair labor practice" for an employer "To refuse to bargain collectively with the representatives of his employees," and §§ 2 and 10 (c) give to the Board an extensive authority to order the employer to cease an unfair labor practice and to compel reinstatement of employees with back pay when employment has ceased in consequence of a labor dispute or unfair labor practice. See *National Labor Relations Board* v. *Mackay Radio & Telegraph Co.*, 304 U. S. 333. While the Act thus makes it the employer's duty to bargain with his employees, and failure to perform that duty entails serious consequences to him, it imposes no like duty on his employees. Since there must be at least two parties to a bargain and to any negotiations for a bargain, it follows that there can be no breach of the statutory duty by the employer—when he has not refused to receive communications from his employees—without some indication given to him by them or their representatives of their desire or willingness to bargain. In the normal course of transactions between them, willingness of the employees is evidenced by their request, invitation, or expressed desire to bargain, communicated to their employer.

However desirable may be the exhibition by the employer of a tolerant and conciliatory spirit in the settlement of labor disputes, we think it plain that the statute does not compel him to seek out his employees or request their participation in negotiations for purposes of collective bargaining, and that he may ignore or reject proposals for such bargaining which come from third persons not purporting to act with authority of his employees, without violation of law and without suffering the drastic consequences which violation may entail. To put the employer in default here the employees must at

least have signified to respondent their desire to negotiate. Measured by this test the Board's conclusion that respondent refused to bargain with the Union is without support, for the reason that there is no evidence that the Union gave to the employer, through the conciliators or otherwise, any indication of its willingness to bargain or that respondent knew that they represented the Union. The employer cannot, under the statute, be charged with refusal of that which is not proffered.

During the eight months preceding the strike respondent had, upon request, entered into negotiations with the Union on some eleven different occasions. Such meetings, always with some known representatives of the Union, were customarily with the Union Scale Committee and on its written request. All negotiations were broken off by the Union by the strike which followed almost immediately its resolutions of March 17th. On July 23rd the strike had continued for about four months, accompanied by picketing, violence and destruction of property, and had culminated, on July 22nd, in a proclamation of martial law. A meeting on June 11th had resulted in no change of attitude on either side. From then until July 23rd no attempt appears to have been made on either side to resume negotiations.

While there was before the Board testimony of the secretary of the Union that on July 23rd he had asked the conciliators to "try and open up negotiations," there was no testimony that respondent or its officers had ever been informed of that fact or that they were advised in any way of the willingness of the Union to enter into negotiations. This was pointedly brought to the attention of the Board and the trial examiner by a motion to strike the testimony of the secretary and that of respondent's president, giving his account of his interview with the conciliators. But the conciliators were not called as witnesses and no attempt was made to supply the omission.

Respondent's president testified that on July 23rd the conciliators asked him if he would meet with them and the Scale Committee; that he replied that he would; that no meeting was arranged and that several days later he called one of the conciliators on the telephone and informed him that he, the witness, "would not have any meeting with him or with the Scale Committee." All else that took place between the conciliators and respondent is left a matter of conjecture.

This testimony, on which the Board relies to support its finding, shows on its face that there was no indication until sometime later than July 23rd of any unwillingness on the part of respondent's president to meet the Union. Furthermore, it contains no hint that the Union at any time after July 5th, and before September communicated to respondent its willingness to bargain, or that the conciliators, in asking a meeting and discussing the matter with respondent's president, purported to speak for the Union. The testimony is consistent throughout with the inference, and indeed supports it, that the conciliators, so far as known to respondent, appeared in their official role as mediators to compose the long-standing dispute between respondent and its employees; that the employer first consented in advance to attend a meeting, and later withdrew its consent when they had failed for some days to arrange a meeting. Whether in the meantime the Scale Committee or any other representative of the Union was in fact willing to attend a meeting does not appear.

Section 10 (e) of the Act provides: ". . . The findings of the Board as to the facts, if supported by evidence, shall be conclusive." But as has often been pointed out, this, as in the case of other findings by administrative bodies, means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. *Washington, V. & M. Coach Co.* v. *National Labor Relations Board*, 301 U. S. 142; *Consolidated Edison Co.* v. *National Labor Rela-*

*tions Board,* 305 U. S. 197; *Appalachian Electric Power Co.* v. *National Labor Relations Board,* 93 F. 2d 985, 989; *National Labor Relations Board* v. *Thompson Products Inc.,* 97 F. 2d 13; *Ballston-Stillwater Knitting Co.* v. *National Labor Relations Board,* 98 F. 2d 758, 764. Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Consolidated Edison Co.* v. *National Labor Relations Board, supra,* p. 229, and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. See *Baltimore & Ohio R. Co.* v. *Groeger,* 266 U. S. 521, 524; *Gunning* v. *Cooley,* 281 U. S. 90, 94; *Appalachian Electric Power Co.* v. *National Labor Relations Board, supra,* 989.

Judged by these tests or any of them we cannot say that there was substantial evidence that respondent at any time between July 5, 1935, and September, 1935, was aware that the Union desired or sought to bargain collectively with respondent, or that there is support in the evidence for the Board's conclusion that on or about July 23, 1935 respondent refused to bargain collectively with the Union.

*Affirmed.*

MR. JUSTICE FRANKFURTER took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, dissenting.

The Labor Board was given jurisdiction by Congress to hear and weigh evidence and to determine the inferences from it; to make findings of fact; and to issue orders necessary to effectuate the purposes of the National Labor Relations Act. In apt language, Congress

limited the power of courts to review the Board's findings by providing in the Act that "The findings of the Board as to the facts, if supported by evidence, shall be conclusive."

I believe that "The inferences to be drawn were for the Board and not the courts," [1] and that the inferences drawn by the Board were supported by the evidence. Courts should not—as here—substitute their appraisal of the evidence for that of the Board.

The Labor Board, the Federal Trade Commission, the Interstate Commerce Commission, the Securities and Exchange Commission and many other administrative agencies were all created to deal with problems of regulation of ever increasing complexity in the economic fields of trade, finance and industrial conflicts. Congress thus sought to utilize procedures more expeditious and administered by more specialized and experienced experts than courts had been able to afford. The decision here tends to nullify this Congressional effort.

The Labor Board concluded that "On or about July 23, 1935, the company refused to bargain collectively with the union as the representative of its employees, or at all, . . ." This conclusion is here set aside only because the Court believes the evidence before the Board did not support its particular underlying finding that "It seems clear that . . . [the] president of the respondent, knew that the union was seeking through the [federal] conciliators to bargain with the respondent with respect to the settlement of the strike."

Undisputed evidence disclosed that on July 23, 1935, the conciliators—at the express instance of the Union—conferred for three or four hours with the president of respondent; that the only purpose of the conciliators

---

[1] *National Labor Relations Board* v. *Pennsylvania Greyhound Lines,* 303 U. S. 261, 271.

302

was to arrange a meeting between the company and the Union in order to bring about collective bargaining; that the president agreed with the conciliators to meet the Union and the conciliators at a date to be set; but that several days thereafter (when the company had obtained other employees and was operating under the protection of the militia) the president—again acting for the company—called the conciliators and flatly refused to meet further with them or the Union. The Court finds only a single link missing in the chain of evidence showing that the company refused to bargain with the Union, i. e., that there was no evidence to justify the Board's finding that the president of the company was aware the conciliators had approached the company at the request of the Union. But the "courts cannot pick and choose bits of evidence to make findings of fact contrary to the findings of" an administrative body.[2] And the story in this record discloses a broad basis for the inference that the company did know it was actually refusing the Union's request.

For thirty-three years prior to July, 1934, the company ran a non-Union plant. About that date, a majority of the employees were organized by an affiliate of the American Federation of Labor. The company first refused to sign an agreement with the Union but did so, July 14, 1934, upon the intervention of the Regional Labor Board functioning under the National Industrial Recovery Act. This agreement was to continue a year, was subject to modification by mutual consent, and provided for arbitration of disputes arising under it. Thereafter, pursuant to the agreement, meetings were held between the Union and respondent and the Union submitted repeated re-

---

[2] Federal Trade Comm'n v. Standard Education Society, 302 U. S. 112, 117; Federal Trade Comm'n v. Algoma Co., 291 U. S. 67, 73; cf., Federal Trade Comm'n v. Keppel & Bro., 291 U. S. 304, 314.

quests and grievances, relating to the "check-off" system, wage increases, the possibility of a closed shop, etc. These were refused and counter grievances of the company were submitted and discussed. In meetings and by mail, the Union continued to submit grievances—that back-pay accrued during shut-downs was owing, that the company was dealing with individual employees and, in March, 1935, that the company by refusing to arbitrate had broken its agreement. March 22, the Union called a strike, the testimony showing that it was called "on account of the company's refusal to honor and abide by the agreement signed before the Labor Board July 14, 1934 . . . [as to] minimum days, wages, and any employee being called out and not used" and because the company had "refused arbitration on this agreement." Thereafter, the company closed its plant, consistently urged individual members of the Union to return to work and desert the Union's efforts—by strike—to obtain collective bargaining, and publicly announced that it would not meet with the members of the Union and that it was willing to take its individual employees back, but "without Union recognition or agreement." June 11, the company did meet with the Union's representatives but insured the impossibility of any successful collective bargaining by reiterating at the outset that the company would not recognize the Union. July 23, the Union asked the conciliators to see the president of the company.

To conclude that the company—through its president— was unaware the conciliators were acting at the instance of the Union, and, therefore, is not to be held responsible for its flat refusal to meet with its employees, is both to ignore the record and to shut our eyes to the realities of the conditions of modern industry and industrial strife. The atmosphere of a strike between an employer and employees with whom the employer is familiar does not

evoke, and should not require, punctilious observance of legalistic formalities and social exactness in discussions relative to the settlement of the strike. It is difficult to imagine that—during several hours of conversation between the conciliators and the company's president concerning a future meeting of Union and company—the conciliators refrained from reference to the Union's request that the conciliators arrange such a future meeting. In a realistic view, the company's statement of July 23 to the conciliators, that it would meet with them and the Union, clearly indicated the company's acceptance of the fact that the conciliators were appearing for the Union. The company's declaration to the conciliators, several days later, that it would not meet with the Union or the conciliators, equally represents the company's recognition and acceptance of the fact that the conciliators were a means of dealing with the Union.

Not only did the Labor Board find the evidence sufficient to show that the company refused to bargain with the Union on or about July 23, but the court below reached the same conclusion. The rule is well settled that findings of fact concurred in by two lower courts will not "be disturbed unless plainly without support."[3] This rule equally applies when an administrative body and a lower court—as here—concur on findings of fact,[4] and the rule is even more persuasive where, as in the Act creating the Labor Board, it is provided that "The findings of the Board as to the facts, if supported by evidence, shall be conclusive." The majority opinion[5] of the Court of Appeals in this case said:

---

[3] *General Pictures Co.* v. *Western Electric Co.*, 304 U. S. 175, 178; *United States* v. *Chemical Foundation*, 272 U. S. 1, 14; *Virginian Ry.* v. *Federation*, 300 U. S. 515, 542.

[4] *Illinois Central R. Co.* v. *Interstate Commerce Comm'n*, 206 U. S. 441, 466.

[5] Three judges sat in the court below. One wrote the opinion for the majority; the second judge concurred in the conclusion of that opin-

"This conclusion [refusal to enforce the Board's action] does not mean that we approve or uphold the refusal of the respondent to meet the request of the conciliators and enter into negotiations looking toward the settlement of disputes after the employees had quit their employment. Respondent's employees were largely unionized. Under the Act, respondent, when requested to negotiate, was in duty bound to do so. National Labor Relations Board *v.* Jones & Laughlin Steel Corp., 301 U. S. 1. Instead it lent a friendly ear to unwise counsel wholly out of sympathy with the legislation designed to avoid and settle capital-labor disputes. It erred in its refusal to respect the law and . . . [ignored] the request of those charged with the burdensome task of working out a peaceful solution of what had become a bitter controversy. There is little or no explanation which we can find for their refusal, save an open, defiant, flouting of the law of the land."

Respondent's striking employees remained employees— while on strike—within the meaning of the National Labor Relations Act (§ 2 (3)) because their work had ceased "as a consequence of . . . [and] in connection with . . . [a] current labor dispute. . . ." The statutory rights of these striking employees could not be destroyed, and respondent could not commit unfair labor practices and then escape liability by reopening the plant with a full complement of non-Union men.

*Second.* The court below was of opinion that the strike of March 22, 1935, violated the particular provision of the July 14, 1934, contract[6] with the company that

---

ion; the third judge dissented but expressly found that there was evidence to support the findings that the company refused to bargain collectively with its employees.

[6] "In any case in which a satisfactory settlement of a dispute arising under this contract cannot be reached, such dispute shall be referred to a Committee of Arbitration composed of two persons

"There shall be no stoppage of work by either party to this contract, pending decision by the Committee of Arbitration." Solely because it believed the Union had violated its contract, the court below declined to enforce the Board's order, and held that the company could not be made responsible for its own violation of the Act.

In this, I believe the court below was in error. A disagreement over the terms of a contract governing employer-employee relations is a labor dispute within the terms of the Act. Such a disagreement can—as it did here—produce industrial strife which the Act was expressly designed to prevent. Had Congress provided that violation of a private contract would deprive employees and the public of the benefits of the law, a different question would be presented. But Congress did not so provide and, in addition, the Union did not violate its contract. It contracted not to strike "pending decision by the Committee of Arbitration" but there was no decision "pending." There was no arbitration pending because the company would not arbitrate. If the contract was broken, it was the company—not the Union—that broke it.

I believe the judgment of the court below should be reversed and that the Board's order should be enforced.

Mr. Justice Reed joins in this dissent.

---

selected by the Management, two persons selected by the Union, and fifth person to be selected by these four, who shall reach a decision which shall be final and binding upon both parties to this contract. There shall be no stoppage of work by either party to this contract, pending decision by the Committee of Arbitration."