James A. CRAIG, Sr., Plaintiff,

v.

Abraham A. RIBICOFF, Secretary of Health, Education and Welfare of the United States of America, Defendant.

No. C-64-WS-60.

United States District Court
M. D. North Carolina,
Winston-Salem Division.

March 28, 1961.

480

Weston P. Hatfield, Winston-Salem, N. C., for plaintiff.

James E. Holshouser, U. S. Atty., Greensboro, N. C., for defendant.

EDWIN M. STANLEY, District Judge.

The plaintiff seeks a review of the final decision of the Secretary of Health, Education and Welfare, Social Security Administration, holding that he was not entitled to "a period of disability" and disability benefits.

Both plaintiff and defendant have moved for summary judgment pursuant to the provisions of Rule 56(a), Federal

Rules of Civil Procedure, 28 U.S.C.A., and have supported their motions by briefs.

■ Under the jurisdictional statute, 42 U.S.C.A. § 405(g), the findings of the Secretary, if supported by substantial evidence, are conclusive, and such conclusiveness extends to inferences logically drawn from the evidence. Fuller v. Folsom, D.C.W.D.Ark.1957, 155 F.Supp. 348; Adams v. Flemming, 2 Cir., 1960, 276 F.2d 901. Substantial evidence means "enough [evidence] to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." National Labor Relations Board v. Columbian Enameling & Stamping Co., 1939, 306 U.S. 292, 59 S.Ct. 501, 505, 83 L.Ed. 660. The burden of proof, both before the referee and in this court, is upon the plaintiff to establish his claim by a preponderance of the evidence. Roberts v. Flemming, D.C.N.D.Ala.1960, 186 F. Supp. 426; Adams v. Flemming, supra; Fuller v. Folsom, supra. We are not authorized, in a proceeding such as this, to substitute our own judgment for that of the referee, and his determinations may not be set aside if there is any legal basis therefor, "even though upon a consideration of all the evidence this court might have reached a different conclusion." Thurston v. Hobby, D.C. W.D.Mo.1955, 133 F.Supp. 205, 209; Julian v. Folsom, D.C.S.D.N.Y.1958, 160 F.Supp. 747.

Plaintiff's application to establish a period of disability and for disability insurance benefits was filed on August 19, 1957. The Bureau of Old-Age and Survivors Insurance, Social Security Administration, denied the application, and plaintiff was so notified on January 6, 1958, and again on January 24, 1958. On July 31, 1958, plaintiff filed a request for hearing before a referee and such hearing was held on November 24, 1958. The plaintiff personally appeared and testified at the hearing and was represented by counsel.

■ The issue before the referee was whether plaintiff was entitled to the establishment of a period of disability (a so-called "disability freeze") under Section 216(i) of the Social Security Act, 42 U.S.C.A. § 416(i), or to disability insurance benefits under Section 223(a) of the Act, 42 U.S.C.A. § 423. The so-called "disability freeze" provision, 42 U.S.C.A. § 416(i), contemplates the elimination from an individual's earnings records of periods during which he was under a "disability" for the purpose of determining, usually at some future time when he may become eligible for benefits, the amount of his average monthly wage, upon which the amount of his benefit is based. The provisions relating to monthly benefits in 42 U.S. C.A. § 423 contemplates the payment of such benefits to an individual under a disability.

■ Plaintiff last met the special earning requirements of the statute on March 31, 1951, and his burden was to establish by a preponderance of the evidence that on or before March 31, 1951, and continuing until he filed his application on August 19, 1957, he was unable to engage in any substantial activity because of medically determinable physical or mental impairment of long continued and indefinite duration. The fact that plaintiff might satisfy the requirements of the statute at some date subsequent to March 31, 1951, does not suffice. The impairment must have had its inception during the period when he met the special earning requirements of the statute.

Following a decision by the referee, the plaintiff, on June 23, 1959, requested that the Appeals Council review the referee's decision. The Appeals Council received additional medical evidence and heard oral arguments by plaintiff's attorney on February 6, 1960, and then rendered a decision finding that the plaintiff's combined impairments were not of sufficient severity to make him continuously unable to engage in any substantial gainful activity on or before

March 31, 1951, when the special earning requirements were last met. Accordingly, it was concluded that the plaintiff was not entitled to a period of disability or to disability insurance benefits for which he had applied, and that the decision of the referee should be affirmed.

In his original application, the plaintiff stated that he first became unable to work in May, 1949, because of anemia, nervousness, skin irritation, and pain in his back which he thought was lumbago. He described his daily activities as assisting his wife in such light housework as sweeping, mopping and dusting, mowing the lawn when he felt like it, walking about a mile a day, and driving his car when necessary. He stated that he had an eighth grade education and had worked mostly as a grocery clerk except for three or four years when he had been an inspector in a furniture factory.

Medical reports from Doctor Glenn R. Frye dated September 4, 1957, and August 14, 1959, show that the plaintiff was admitted to the Richard Baker Hospital on May 17, 1949, in an anemic condition, with his blood picture being that of pernicious anemia. He was treated with blood transfusions and liver extract, and was discharged much improved on July 7, 1949.

Doctor H. E. Barnes stated on September 4, 1957, that he had treated plaintiff in 1945 and in 1949, when he developed pernicious anemia, and had to quit work. He stated that he had seen plaintiff only once since that time, in 1953, at which time he had not improved enough to return to work. On August 12, 1959, after having been requested for his physical findings, Doctor Barnes stated that he could give no further information.

Plaintiff was examined by the Veterans Administration on February 25, 1952, and on November 13, 1953, in connection with his application for a pension. He complained on these occasions of a general run-down condition, anemia, nervousness, trouble with his legs, and trouble with his stomach. On a physical examination in February, 1952, his carriage was good, posture erect, and gait steady. He had a dry eczema on the back of his left hand and on his right ankle. His heart action and rhythm were regular with no murmurs heard. He had no history of unsual chest pains. His pulse and blood pressure were normal. Respiratory and digestive systems were negative. He had a tumor mass about the size of a lemon, probably benign, in his testicle. His prostrate was enlarged, soft and tender. There was no swelling or limitation in any joint of his extremities. Blood count and urinalysis were normal. Plaintiff's diagnoses at that time were: Chronic eczema on the left hand and ankle, chronic prostatitis, tumor of right testicle and pernicious anemia in remission. When plaintiff was examined in November, 1953, he had no indication of pernicious anemia in the past year. Physical findings were substantially as in February, 1952, except that some residuals of pernicious anemia were seen in the lower extremities. Plaintiff complained of numbness and at times a tingling sensation in each foot, and sensory perception was altered in both lower legs and feet.

Dr. E. B. Brooks stated in his reports of September 15, 1957, and May 23, 1958, that he had seen plaintiff three times between the first visit on August 10, 1953, and his last visit on February 21, 1957, at which time a blood count showed pernicious anemia. He stated that plaintiff could be helped if he would take treatment or anti-pernicious anemia medicines, but that he would not take care of himself, possibly as a result of mental insufficiency attributable to pernicious anemia. He felt that plaintiff was unable to work and doubted that he ever would be able to work.

Doctor Wingage M. Johnson saw plaintiff only once, on April 28, 1959. Plaintiff's blood count was within normal limits when Doctor Johnson saw him. Doctor Johnson stated that he had been

told by Doctor Brooks that plaintiff had suffered some cerebral damage from past low levels in his hemoglobin and red cells, plus some cerebral arteriosclerosis. Doctor Johnson's impression was that plaintiff had anxiety with depression, cerebral arteriosclerosis and pernicious anemia, controlled by treatment.

On September 4, 1959, plaintiff was examined by Doctor C. Glenn Sawyer at the request of the North Carolina State Board of Public Welfare. Plaintiff stated at that time that his nervousness dated back to World War I. He had not been taking liver medication on any regular routine, and had had no intra-muscular injections of liver since 1958, or perhaps earlier. Blood work had not been followed in any regular fashion. There had been no weight loss during the past two years. Plaintiff stated that he had made only two real attempts to work since 1949, both in the grocery business. After a complete physical examination, including complete blood count and urinalysis, Doctor Sawyer diagnosed plaintiff's condition as "benign prostatic hypertrophy which is causing few symptoms at present, chronic anxiety with somatization, hemorrhoids and hydrocele." He commented as follows:

"Although he is alleged to have pernicious anemia in the past, one is somewhat suspicious of this diagnosis in view of the normal blood findings at this time, despite the absence of any consistent pernicious anemia program during the past few months (as far as I can tell). Although his vibratory and position sense both appeared to be impaired, it is somewhat difficult to be certain regarding these as these are both subjective rather than objective determinations and there is no question but what his anxiety symptoms go back a good many years and actually he dates them back to World War I. * * *"

A psychiatric examination of plaintiff was done on October 26, 1958, by Doctor Angus Randolph. Plaintiff was de-scribed as a nice looking, well dressed and groomed man of 64, quite asthenic, slightly emotionally labile and shaky, but otherwise in no acute distress. He showed no peculiarities in mannerism or behavior; speech was relevant, co-herent and well associated. He had no definite delusions, hallucinations, ideas of reference or influence, or definite obses-sive-compulsive trends, as such. He was well oriented and his sensorium was clear. His memory for recent events was poor, attention and concentration were fair, but not too reliable, judgment in discussion was "pretty good" and in-sight was fair. Plaintiff complained at that time that his mental capacity was not as acute and good as it used to be. He also complained of being emotionally upset over little things, and having crying spells for no apparent reason, as well as some difficulty in concentration, and recent memory loss. He described his daily activities as helping his wife with the housework, doing a little yard work, patching up a little furniture here and there, reading and television. Doc-tor Randolph stated that it was his im-pression that plaintiff had a chronic brain syndrome, early senile degenera-tion from a mental point of view. Prog-nosis was guarded. It was recommend-ed that plaintiff be considered for Social Security help, but there was no indica-tion that any specific therapy was needed.

At the hearing before the referee, plaintiff testified that his education lacked a little of finishing high school; that he worked for four or five years in a factory as an inspector in a cabinet sand-ing department, but had been in the grocery business most of his life; that he and his wife owned an eight-room house which provided rental income of about $130 a month; that he helped his wife clean the rented rooms; that he did all the shopping for groceries; that he took liver capsules off and on; and that his applications to the Veterans Admin-istration for a pension had been twice denied. Plaintiff's earnings record showed that he was paid $840 in the last two quarters of 1952, and he testified

that he was separated from two jobs in this period because his employers told him that he was not able to work.

As earlier noted, plaintiff is not eligible for a period of disability unless the evidence established the presence of such impairment as to preclude him from engaging in substantial gainful activity, beginning no later than March 31, 1951, and continuing until the date he filed his application. Plaintiff alleged that he became unable to work in 1949, when he was hospitalized with a diagnosis of pernicious anemia. His response to treatment, however, was excellent, and this condition has remained in a state of remission for the most part since that time, even in the absence of consistent treatment. Doctor Sawyer was inclined to doubt that plaintiff had had pernicious anemia, in view of the normal blood findings in September, 1959, despite the absence of any consistent anemia program during the preceding few months. At the time of the report of plaintiff's examination by the Veterans Administration in February, 1952, in connection with his application for a pension, almost three years after the date he alleged he became unable to work, and almost a year after he was last insured, he was described as having good carriage, erect posture and a steady gait. He had dry eczema on the back of his left hand and his right ankle, a tumor in his right testicle, and chronic prostatitis. Subsequent examinations established that both of these later conditions were benign. His blood count was normal and his pernicious anemia was described as in remission. There was no swelling or limitation of motion in any joints of his extremities. His sensorium was clear and he was well oriented. The evidence also indicates that plaintiff sought medical treatment for his alleged complaints at very infrequent intervals, from which it is reasonable to infer that his symptoms were not as severe as he alleged them to have been. Doctor Barnes, plaintiff's family physician when he had an attack of anemia in 1949, stated that he had seen plaintiff only once after that time, in 1953. Doctor Brooks saw plaintiff only three times between August, 1953, and February, 1957, and stated that plaintiff could be helped if he would take treatments.

All of the complaints which form the basis of plaintiff's allegation that he was unable to work were shown by the evidence to lack that degree of severity which would prevent him from engaging in substantial gainful activity. He had worked in spite of "his nervousness" which had been present since World War I. His skin condition had been irritating, but nothing more. Although he complained of weakness and numbness in his legs, he was fully ambulatory to the extent of being able to walk a mile a day. He had full use of his arms and hands. He helped his wife to take care of an eight-room house, did all the shopping for groceries, did some yard work, patched up furniture, and spent some time reading and watching television. Such activities represented a fairly normal daily routine, and when considered with the medical evidence, strongly negate any inferences that plaintiff's overall functional ability was so severely reduced that he could not engage in any substantial gainful activity beginning not later than March 31, 1951.

No doctor stated that plaintiff was unable to work prior to the expiration of his special insured status on March 31, 1951. Even if his condition worsened after that date, such deterioration cannot be considered here. Roberts v. Flemming, D.C.N.D.Ala.1960, 186 F.Supp. 426. On September 15, 1957, Doctor Brooks stated that plaintiff could be helped if he would take treatment or anti-pernicious anemia medicines. On May 28, 1958, Doctor Johnson reported that plaintiff's pernicious anemia was controlled by treatment. A remedial impairment cannot constitute a "disability" within the meaning of the "disability" provisions of the Social Security Act. Theberge v. United States, 2 Cir., 1937,

87 F.2d 697. Section 404.1501(g) of the Social Security regulations, 20 C.F.R. 404.1501(g), which was in effect when plaintiff filed his application, interprets the term "disability" as follows:

"(g) Impairments which are remediable do not constitute a disability within the meaning of this section. An individual will be deemed not under a disability if, with reasonable effort and safety to himself, the impairment can be diminished to the extent that the individual will not be prevented by the impairment from engaging in any substantial gainful activity."

Further, Senate Report No. 1987, 83rd Congress, Second Session, at Page 3730, U.S.Code Cong. & Adm. News 1954, reads:

"An individual would not meet the definition of 'disability' if he can, by reasonable effort, and with safety to himself, achieve recovery or substantial reduction of the symptoms of his condition."

Plaintiff was not only required to show that he was unable to do the kind of work that he had been accustomed to perform, but must also show that he could not engage in any other type of substantial gainful activity. Sampson v. Flemming, D.C.D.Kan.1960, 189 F.Supp. 725.

The court, after carefully reviewing the file and various medical reports, is unable to say that the plaintiff has sustained the burden of establishing that he had an impairment, or a combination of impairments, on or before March 31, 1951, the last day of his special insured status, and continuing until August 19, 1957, when he filed his application to establish a period of disability and for disability insurance benefits, of sufficient severity to make him continuously unable to engage in any substantial gainful activity. The court is further unable to say that the findings of fact and inferences of the referee, who considered all the evidence now before the court, are unsupported by substantial evidence.

Accordingly, a judgment will be entered granting the defendant's motion for summary judgment, affirming the decision of the Secretary, and dismissing the complaint.