**Donald D. MILLET, Plaintiff-Appellant,**

v.

**Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendant-Appellee.**

**No. 80-3464.**

United States Court of Appeals, Fifth Circuit.*

Unit A

Dec. 7, 1981.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96-452—October 14, 1980.

Louis R. Koerner, Jr., New Orleans, La., for plaintiff-appellant.

Leonard P. Avery, Asst. U. S. Atty., New Orleans, La., Alan M. Grochal, Baltimore, Md., for defendant-appellee.

Before BROWN and TATE, Circuit Judges, and SMITH **, District Judge.

PER CURIAM:

## I.

Claimant, Donald D. Millet, urges a review pursuant to § 205(g) of the Social Security Act (The Act), 42 U.S.C.A. § 405(g), of a final decision of the Secretary of Health & Human Services, denying his claim for Social Security disability and supplemental security insurance benefits. Alleging that he became unable to work on February 26, 1976, due to lung trouble, pain, fatigue, and loss of memory, taste and smell, Millet filed applications for benefits on April 28, 1976 and May 5, 1976. At the time of his alleged disability, Millet, a 44-year-old carpenter, was employed at the Hooker Chemical Corporation plant in Taft, Louisiana, by Dravo Company, which was engaged in constructing a chlorine addition to the Hooker plant. In August 1974, Millet was severely exposed to a chlorine gas cloud when a gasket near which he was working burst. He was treated at the first aid station and later at a local hospital.

The Administrative Law Judge (ALJ), and, subsequently, the Appeals Council found Millet not under a disability and hence not entitled to benefits. The District Court affirmed this finding on May 27, 1980, granting the Secretary's motion for Summary Judgment. Millet appeals this final decision and urges that the court's finding of non-disability within the mean-

** District Judge of the Northern District of Mississippi, sitting by designation. Judge Orma R. Smith was a member of the panel that heard oral arguments, but due to illness did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

ing of the Social Security Act is not supported by substantial evidence. In support of this proposition, Millet challenges as error the ALJ's (i) giving more weight to the testimony and opinion of Dr. Paddison, the medical advisor who had never examined Millet, and, conversely, insufficient weight to the opinion of his treating physician, (ii) refusing to consider the subjective evidence of Millet's disability, (iii) allowing the medical advisor Paddison to testify also in the capacity of a vocational expert, and (iv) failing to establish that there were actual jobs in the national economy which Millet could perform. Finding a lack of testimony as to a crucial point, we reverse and remand.

## II.

*Scope of Review: Look But Don't Touch*

■ In reviewing the findings of the Secretary, a court may not reweigh the evidence nor substitute its own judgment. *Knott v. Califano*, 559 F.2d 259 (5th Cir. 1977); *Laffoon v. Califano*, 558 F.2d 253 (5th Cir. 1977). Yet this very narrow ambit of judicial review does not release us from our responsibility to scrutinize the record in its entirety to determine whether substantial evidence does support the Secretary's findings. *Flowers v. Harris*, 616 F.2d 776 (5th Cir. 1980); *Simmons v. Harris*, 602 F.2d 1233 (5th Cir. 1979).

"Substantial evidence is more than a scintilla, and must do more than create a suspi-

cion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Johnson v. Harris*, 612 F.2d 993, 997 (5th Cir. 1980), *citing N.L.R.B. v. Columbian Enameling and Stamping Co.*, 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660 (1939). Notwithstanding the limited nature of this review, the Court can reverse a finding of the Secretary if not supported by substantial evidence. *Id.*[1]

## III.

*The Burden of Proof Seesaw*

■ The scheme of the Act in effect calls on the claimant to show the existence of a disability by proving that he is unable to perform his previous work. 42 U.S.C.A. § 423(d)(1)(A), (2)(A).[2] Once he does so, the Secretary must convince the fact finder that there is other substantial gainful employment in the economy which the claimant can perform. If the Secretary adequately points to likely alternative employment, the claimant must then have the opportunity to show his inability to perform those jobs. *Wilkinson v. Schweiker*, 640 F.2d 743, 744 (5th Cir. 1981); *Western v. Harris*, 633 F.2d 1204, 1207 (5th Cir. 1981); *Fortenberry v. Harris*, 612 F.2d 947, 949 (5th Cir. 1980).

## IV.

Claimant Millet, age 44, testified before the ALJ that he had completed high school

1. *See McDaniel v. Harris*, 639 F.2d 1386, 1389 n.3 (5th Cir. 1981), for a list of cases in which we have reversed the Secretary's finding of no disability because not supported by substantial evidence.

2. 42 U.S.C.A. § 423(d)(1). The term "disability" means—
    (A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months;
    (2) For purposes of paragraph (1)(A)—
    (A) an individual (except a widow, surviving divorced wife, or widower for purposes of section 402(e) or (f) of this title) shall be

determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

and had served in the Marine Corps for 16 years where he was trained in radio/radar technology.[3] In addition, Millet operated a seafood market for his uncle for one year and was employed for a short time as a construction worker.

From September 1973 until August 1974, Millet worked as a carpenter at Hooker Chemical Co. Exposure to toxic chemical fumes resulted in hospitalization for one day in November 1973. His present claim of disability derives from a severe exposure in 1974.

Following his exposure to the chlorine gas, Millet moved to a new job—chief steward for a local carpenter's union—in 1976. Due to personality disorders and fatigue, he resigned this position on the recommendation of his treating physician, Dr. Borgmen.

Following extensive testimony by Dr. Paddison—the agency's physician who had never examined Millet but only reviewed the files for a few hours—the ALJ and Appeals Council concluded that Millet could not perform his previous job as a carpenter or "engage in strenuous physical activities or do work requiring a good deal of 'verbal memory'". The record amply supports this finding. However, the ALJ went on to find that Millet was not precluded (i) from "his former non-strenuous work as a carpenter's foreman or union steward" . . . or (ii) from performing other "types of light or sedentary work existing in the national economy". These findings imply that claimant Millet had failed to meet his initial showing that he was precluded from engaging in his previous, usual line of work, which *included* shop steward and foreman, and, therefore, was not entitled to disability benefits.

Millet's subjective testimony, collaborated by his wife's,[4] demonstrates that since his exposure to toxic chemicals, he had experienced psychological problems and changes in his personality and behavior—irritability and impatience—which had affected his ability to perform his former job as a union steward.[5]

3. The Veterans Administration has since given him a 100% disability rating.

4. EXAMINATION BY MR. KOERNER: (Mrs. Millet)

Q Okay, Mrs. Millet, before this gas exposure, what kind of disposition did your husband have?

A Beautiful.

Q Well could you be a little more specific?

A Well he wasn't nervous, you know, he was easy going, outgoing.

Q Did you notice after the gas exposure, was there any kind of change in his personality? Tell me what kind?

A He didn't go out anymore and did things like we did before. He wouldn't go out to dinner and dance—.

Q Did you hear, did you talk to anybody about the affect that this may have, or did he tell you about how that affected his job? Or *did he tell you about things that happened on the job?*

A Just what the doctors—.

Q Now since he stopped working, did you notice any change in his disposition?

A He didn't do anything, you know, like he's tired all the time and he needs to rest, he can't do things like he used to.

Q Is he as easy going as he once was or would you describe him as somewhat different now?

A He is different.

Q Is it harder to live with him?

A Um uh.

Q Is he as patient as he once was?

A No he isn't.

Q Could you give me some specific time when things are different now than they were before?

A Different (inaudible), different little things, you know. He forgets a lot of things. He, tells me to do something, or asks me, he forgets where he puts things and stuff like that.

Q Was he always, before this gassing, was he the person who basically ran the household or was in control or the boss of the family?

A Yes he was.

Q Has he had any difficulty in keeping in that role?

A Well he doesn't do anything like that anymore.

Q Is he of any assistance to you around *the house in the housework?*

A No.

Q Has he ever tried to work around the house at times?

A Yes he tried cutting grass, but he couldn't even do that.

5. ALJ: What job was that?

MR. KOERNER: The steward job.

MR. MILLET: Yes, that's when I think that I started changing in the beginning, I didn't have any problems. I didn't go *there as a* steward, I went there as a carpenter, and

Millet further testified that since his last job in February 1976 as a union steward, he has suffered a loss of memory, taste and smell, depression, shortness of breath when climbing stairs or walking for several blocks, general fatigue and weakness, loss of weight, nervousness, and persistent diarrhea.

With regard to these subjective symptoms, the ALJ found medical evidence sufficient to support Millet's claim of loss of taste and smell, but no medical evidence that would support Millet's claim of fatigue or indicate a severe psychiatric or psychological problem that would limit his functional capacity with the possible exception of work requiring verbal memory.[6] The ALJ further commented that at the hearing Millet had answered all questions without

any apparent difficulty. "He certainly was fully coherent, quite intelligent and there was no observable emotional or psychiatric problem." As collaboration of this latter point, the ALJ specifically referred to Dr. Paddison's opinion as a trained psychiatrist who "saw no significant loss of mental status. His letter of October 8, 1978, clearly indicated that he did not think claimant had a severe psychiatric or psychological impairment." R. vol. II at 27. This latter finding appears inconsistent with Dr. Paddison's live testimony at the hearing.[7]

## V.

### Have Gun, Will Testify

In reaching his findings,[8] the ALJ relied on physicians' reports and the following live

after I was there a couple months, they asked me if I would take the steward's job, and in the beginning everything was fine, but, towards the end, it required a lot of walking and a lot of give and take, trying to talk people into selling for different things and I noticed I started changing. I got kind of mad at people and I never was like that before. I got so I was irritable, it got to where they were bothering me and I was getting weaker and I found myself, I couldn't walk and do as much and I passed out about 3 times while I was employed with those people and I got weaker and weaker and that's when I started this trouble with the running to the bathroom, but the lack of strength and everything else and all the other troubles I was having, I went to Dr. Borgmen, and Dr. Borgmen determined I should retire.

Q Before these chlorine spells, could you describe your basic personality and how you dealt with other people?

A I was a lot different. I was always happy and go lucky, I never worried about nothing.

Q Now has that changed, or did your co-workers notice a change in you at Garyville?

A They tell me they did. They say I went from one type of person, my personality changed, but where I used to be happy go lucky, I could do things by talking to them and I would josh with them and playing around with them and I used to get a lot done just by kidding with them and so forth, but it got so that they claimed I had changed quite a bit, my personality had changed. I was getting irritable, I couldn't put up with as much stuff as I normally would put up without blowing my top.

6. The ALJ stated in Finding No. 6 of his recommendations:

"The evidence does not establish that claimant suffers with pain, weakness or physical or emotional limitations of severe degree. Allegations of severe pain, weakness or limitations of normal bodily or mental functioning are not credible." R. vol. II at 30.

7. Q Okay, do psychological things disable people?
   A They can sir.
   Q *Okay. Is there evidence in this record of psychological problems sufficient to interfere with Mr. Millet's ability to work?*
   A *I can't comment about that because I don't think that that area was explored adequately.*
   Q Okay, so in other words, what we have is that on this particular point, there's insufficient evidence in this record, there's some, but there's insufficient, in your opinion, for you to make a certain medical diagnosis of that or advise the court on that point with certainty, is that a fair statement?
   A I would say this, if he has a psychologically induced depression of the magnitude to give all the myriad complaints that I have heard, from both him and the record, that he probably is in need of treatment of his depression, that's all I can say. (Emphasis added).

8. Claimant's work as a foreman of carpenters or as a union representative certainly was not physically strenuous. In contrast to claimant's characterization of his abilities, the medical evidence does not demonstrate any significant limitation in claimant's mental faculties or such reduction in his memory as to prevent him from performing such work or any well based medical reason as to why claimant would be unable to return to such jobs.

testimony by Dr. Paddison who was doubling in brass as a medical adviser and an unannounced vocational expert:

Q   All right, do you think claimant has the capacity, the functional capacity to perform work of any kind?

A   Certainly I would feel that any sedentary form of work, like gate guard or there are many things where you sit and don't have to walk.

Q   All right, do you think that he would be limited to sedentary kind of work?

A   Well I'd give him the benefit of the doubt in terms of his respiratory problem.

Q   Claimant's last work was as a union steward.  He was obviously doing no physical work at that time, he was walking of course and he was talking.  Do you see any limitation for that kind of activity based upon the objective medical records?

A   No sir, I think that if he could do that at his own pace, so to speak, that he ought to be able to function in that capacity.

■ In this testimony, Dr. Paddison, in effect, testified as a vocational expert, giving his opinion as to jobs Millet could perform.  Although Dr. Paddison has excellent professional qualifications as a physician, the record contains nothing to indicate that he has had any training as a vocational expert, and the Government made no effort to qualify him as such.  Absent his statement, the record contains nothing to substantiate this finding of vocational capacity.  There is no testimony from a trained and properly qualified vocational expert to suggest the types of light work Millet could perform given his range of psychological and physical competence.  Yet the ALJ credited Dr. Paddison's testimony and based his finding that Millet was capable of light, sedentary work solely thereon.  There we believe the ALJ exceeded his discretion.

This state of the record is strikingly similar to that in the recent case of *Rodriguez v. Schweiker*, 640 F.2d 682 (5th Cir. 1981).  Rodriguez, who had suffered severe injuries to his right hand, testified that he was unable to obtain employment as a mechanic—his previous vocation.  Instead, he worked as a security guard, but eventually resigned that position based on his doctor's recommendation.  No medical evidence appeared in the record to refute Rodriguez's testimony that he could not work as a security guard.  Thus, the court held that Rodriguez had made out a *prima facie* case of disability and that "[o]nce a claimant has met his burden, an ALJ may not suggest narrow areas of possible employment and assert that the claimant can perform them without some support in the record, either through medical testimony or reports or some type of vocational testimony."  640 F.2d at 686.

In *Epps v. Harris*, 624 F.2d 1267 (5th Cir. 1980), the court had before it for review a similar problem.  The Secretary had denied social security benefits.  Epps, a walking dictionary of medical ailments, testified that his disability prevented him from resuming his prior job as military records clerk.  Reversing the ALJ's findings, this court held:

[W]hile the hearing examiner may have permissibly concluded that [Epps'] *pain* was not of crippling degree, there is no evidence upon which the ALJ could have determined that Epps' restricted *motion* did not prevent him from working as a records clerk.  *No vocational expert testified that this position was so sedentary that it did not involve bending or stooping to retrieve material.*

624 F.2d at 1274 (emphasis in original and added).  *See also DeMandre v. Weinberger*, 414 F.Supp. 784, 787 (E.D.La.1976).

■ The ALJ's conclusion that Millet could do light and sedentary work must necessarily rest on certain assumptions.  We recognize that it is permissible for an ALJ, without the testimony of a vocational expert, to take administrative notice of the fact that certain jobs are light and sedentary in nature and exist in the national economy.  *Fruge v. Harris*, 631 F.2d 1244, 1247 (5th Cir. 1980); *Rodriguez*, 640 F.2d at 685.  But in view of the considerable contention on this subject in the record, there

should have been proof of the availability of "substantial" gainful activity of a light and sedentary nature in which Millet is capable of engaging. Since none appears in the present record, and since therefore Dr. Paddison's testimony alone could not support the ALJ's conclusion, we remand the case to the Secretary for the development of a more complete record. Obviously, we do not hold that Millet is entitled to benefits nor do we reach at this time Millet's other claims.

REVERSED AND REMANDED WITH INSTRUCTIONS.