Barry K. THOMAS, Plaintiff,

v.

Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.

No. 84–555–CIV–EPS.

United States District Court, S.D. Florida, Miami Division.

Nov. 14, 1984.

Carolina A. Lombardi, Legal Services of Greater Miami, Miami, Fla., for plaintiff.

Robert Rosenberg, Asst. U.S. Atty., Miami, Fla., for defendant.

## MEMORANDUM OPINION AND ORDER REVERSING THE SECRETARY'S DECISION

SPELLMAN, District Judge.

THIS CAUSE is before the Court to review the final decision of the Secretary of Health and Human Services (HHS) determining that plaintiff is not entitled to supplemental security income benefits pursuant to 42 U.S.C. § 1381 *et seq.*

For the reasons stated below, the Court reverses the decision of the Secretary and remands this cause to the Secretary for further proceedings not inconsistent with this Opinion.

## BACKGROUND

The claimant is 30 years of age. On February 2, 1978, plaintiff was arrested and charged with robbery, unlawful possession of a firearm and two counts of murder. He was ultimately tried on all charges and found not guilty by reason of insanity. He was committed to South Florida State Hospital on February 19, 1981. The plaintiff remained institutionalized until March 10, 1982 at which time he was released to the Forensic Unit of the Passageway House. Plaintiff may only leave Passageway House upon court order and in the company of an escort.

The plaintiff testified before the Administrative Law Judge. He said he could not work because job supervisors put too much stress on him, and his medication makes him drowsy. He stated he does not watch television because the television talks back to him. He does not socialize with the other residents because he becomes annoyed when they ask him for cigarettes. Plaintiff described auditory hallucinations where voices make suggestions to him, but said he has learned not to do what the voices tell him.

Plaintiff's medical treatments consist of individual psychotherapy sessions, plus a Prolixin injection on a two week basis.

Edward Hanley, Direct Service Supervisor of Passageway House, testified he sees the plaintiff on a weekly basis. He described the claimant as being withdrawn, not only to fellow residents, but to true involvement in the program.

A psychiatric report, dated March 5, 1981, was prepared by an unnamed psychiatrist from South Florida State Hospital. The doctor reported plaintiff had admitted shooting the women because voices told him to. Plaintiff admitted seeing ghosts, and hearing a female voice and Jesus talking to him. The plaintiff believed people on the street wanted to kill him. The diagnoses of the March 5, 1981, report were: schizophrenic disorder, paranoid type, chronic; mixed substance abuse, in remission; mixed personality disorder; history of gun-shot wounds.

A psychological evaluation was performed on March 10, 1981, by Steven J. Kaplan, Ph.D., a clinical psychologist. The plaintiff revealed to Dr. Kaplan that his paranoid thoughts had begun in his teen years. He reported being shot by his brother when he tried to "stake" his sister-in-law, believing her to be a vampire. Dr. Kaplan believed the plaintiff had some insight into the nature of his disorder, and with psychotherapy and psychotropic medication, his prognosis would be somewhere between guarded and fair. Dr. Kaplan's diagnoses were: schizophrenia, paranoid type, chronic; mixed substance abuse, in remission.

On August 25, 1981, a Final Summary for Disposition was prepared by Dr. Alida Reinoso of the South Florida State Hospital. Dr. Reinoso reported the plaintiff's stay at South Florida as difficult due to plaintiff's refusal to take medication. He displayed no remorse for his murder of the two girls, and admitted to past auditory hallucinations. Dr. Reinoso reported that plaintiff thought people who committed murder would acquire the ability to fly.

On the night of the crime, plaintiff was watching a KKK program on television and thought they were making references to him. Dr. Reinoso reported plaintiff was living in a highly structured environment with 24 hour psychiatric service, but cautioned that what might happen in the community under a stress situation was unpredictable. Dr. Reinoso concurred with the recommendation of the Forensic Disposition Board of September 1, 1981, that plaintiff remained mentally ill. It was the Board's opinion that plaintiff was manifestly dangerous to himself and others, and he continued to meet Florida Statute § 394.-467(1)'s criterias for involuntary hospitalization.

A Final Summary Report was prepared by Dr. Dennis F. Koson upon claimant's discharge from South Florida State Hospital on March 10, 1982. Dr. Koson reported plaintiff being placed on Prolixin. He found no evidence of aggressiveness, hostility or seclusion; he found plaintiff to no longer be a danger to himself or others. His final diagnosis was schizophrenic disorder; paranoid type, in remission.

In June of 1982, the plaintiff was released to Passageway House, a residential treatment center.

While at Passageway, plaintiff was treated biweekly at the Miami Mental Health Center. The Center also prescribed Prolixin. The Center's diagnosis was schizophrenia, paranoid type, in remission with medication.

On September 20, 1982, the claimant underwent a psychiatric evaluation by Dr. George W. Metcalf, a consulting psychologist. He noted the claimant was neither depressed nor euphoric. Mood was appropriate and there was no marked degree of flatness. Plaintiff told Dr. Metcalf that he was afraid of ghosts and believed that the ghosts of the two girls he killed were often about.

The plaintiff was placed in a Work Adjustment Program administered by the Jewish Vocational Service in February of 1983. He was discharged after a short period because he became so drowsy after his Prolixin injections that he could not work and needed to lie down. Furthermore, claimant expressed a strong dislike for the program and a desire to be trained as a welder. He was unable to understand that his medication would make welding unsafe for him. It was the Service counselor's opinion that plaintiff could not complete any kind of vocational training unless his performance under medication could be better controlled.

On March 23, 1983, the Miami Skill Center refused to accept plaintiff into its welding program because of his need for Prolixin.

On June 29, 1983, plaintiff was evaluated by Dr. Norman Reichenberg, a Clinical Psychologist. Dr. Reichenberg reported that patterns suggesting paranoid-schizophrenic functioning were still present, and were not likely to change significantly. Dr. Reichenberg believed that if plaintiff could avoid intense stress or be under periodic supervision, he should be able to function as an out-patient. Dr. Reichenberg recommended plaintiff remain at Passageway House.

On July 5, 1983, plaintiff was seen by Dr. Lloyd R. Miller, a Forensic Psychiatrist. Dr. Miller reported that plaintiff was "lacking in mental illness." However, Miller noted that "... he may have a background of anti-social behavior which might cause him to act out in an anti-social manner in the future." *See* Transcript p. 150. Dr. Miller recommended claimant remain under supervision to insure continued stability of his mental and emotional condition.

On July 6, 1983, the plaintiff was evaluated by Dr. Charles B. Mutter, a Board certified psychiatrist. Dr. Mutter's opinion was that claimant met the criteria for competency. However, he recommended plaintiff's release from Passageway be delayed until such time as plaintiff was able to seek employment. Dr. Mutter pointed out that employment is a stressful situation, and plaintiff is sensitive to stress. Dr. Mutter concluded that:

"Until it can be shown that he is able to tolerate greater levels of stress, he should not be left unsupervised under *any* circumstances whatsoever." (emphasis supplied)

*See,* Transcript p. 153.

Dr. William Corwin, a psychiatrist, examined plaintiff on July 13, 1983. Dr. Corwin reported improvement in schizophrenic illness. He expressed opinion that there existed residual symptoms, particularly in plaintiff's emotional reactions. He recommended plaintiff remain at Passageway in order to determine the constancy of his improvement, and upon release, an aftercare program developed.

## STANDARD OF REVIEW

 Although this Court's usual focus in reviewing Social Security Disability determinations is on the question of whether the claimant carried the burden of showing he could no longer perform his customary work, and if so, whether the secretary carried the rebuttal burden of showing there was indeed work available which claimant could perform, *Wilkinson v. Schweiker,* 640 F.2d 743, 744 (5th Cir.1981); *Lofton v. Schweiker,* 653 F.2d 215, 217 (5th Cir.1981), the social security regulations provide that in some instances a disability determination may be made on the basis of medical evidence alone. *Id.* In such cases the question on review is whether the Secretary's determination that a claimant is not suffering from a severe impairment is supported by substantial medical evidence. 42 U.S.C. § 405(g); *Walden v. Schweiker,* 672 F.2d 835 (11th Cir.1982). Substantial evidence is:

"more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*NLRB v. Columbian Enameling and Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660, 665 (1939), quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.

126, 140 (1938); *accord Anderson v. Schweiker,* 651 F.2d 306, 308 (5th Cir.1981).

The Social Security Administration sets forth a specific sequential process of evaluation for the Secretary to employ in assessing disability claims. The regulations provide that "... current work activity, severity of the impairment[s], and vocational factors" be "assessed in that order." 20 C.F.R. § 404.1503(a) (1980).

 In making a determination of disability or no disability, the first inquiry is whether the individual is currently engaged in substantial gainful activity. If the claimant is not engaged in substantial gainful activity, the question is then whether the individual has any severe impairment. *Brady v. Heckler,* 724 F.2d 914, 917 (11th Cir.1984). A claimant is severely impaired if he has a condition "which significantly limits his or her physical or mental capacity to perform basic work related functions." 20 C.F.R. § 404.1503(c) (1980). The regulations have defined basic work activities as:

".. we mean the abilities and aptitudes necessary to do most jobs. Examples ... include—

(1) physical functions such as walking, standing, sitting, ...;

(2) capacities for seeing, hearing, and speaking;

(3) understanding, carrying out, and remembering simple instructions;

(4) use of judgment;

(5) responding appropriately to supervision, co-workers, and usual work situations; and

(6) dealing with changes in a routine work setting."

20 C.F.R. § 404.1521(b).

The regulations direct that if the Secretary finds that the claimant does not have a severe impairment, the claimant is considered not to be under a disability *without consideration* of the vocational factors. (emphasis in original) 20 C.F.R. § 404. 1503(c) (1980); *Brady v. Heckler,* 724 F.2d at 917.

The Eleventh Circuit has held that:

An impairment can be so considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.

*Brady v. Heckler,* 724 F.2d at 920.

 The Administrative Law Judge described the plaintiff's illness as a "nervous condition," and noted that although plaintiff might have "some restrictions" to overall attitude to others, "the existence of significant inability to otherwise perform usual functioning has not been persuasively demonstrated." These conclusions, are simply not supported by the evidence.

The Plaintiff here is not a rational individual. Notwithstanding the clear demonstration of the medical evidence that plaintiff is still in need of 24 hour psychiatric help, and the fact that Plaintiff has before murdered as a result of his inability to separate fantasy from reality the Administrative Law Judge believes that Plaintiff was not disabled. This Court is at a loss for a plausible explanation of how an individual with this type of medical history can be considered by the Administrative Law Judge to just be suffering from a "nervous condition."

The Administrative Law Judge makes reference to the basic work activities outlined in 20 C.F.R. § 404.1521(b). However, he failed to mention such necessary work related abilities as: (1) ability to understand, carry out and remember simple instructions; (2) use of judgment; (3) responding appropriately to supervision, co-workers, and usual work situations; and (4) dealing with changes in a routine work setting. This Court believes that the plaintiff is unable to meet these requirements.

First, if plaintiff is drugged to the point of having to lie down while on the job, it can hardly be said he has such use of his judgment as to be regarded as a capable employee. Further, all employment carries with it some amount of stress. Plaintiff obviously failed to cope with life's normal stressful situations when he murdered the two girls, and still, while at Passageway would not socialize with the other patients because he could not deal with them asking him for cigarettes. It is obvious to this Court that plaintiff meets the social security's description of being "severely impaired."

For all of the above reasons, the decision of the Secretary is hereby reversed and this cause is remanded for further proceedings not inconsistent with this Order.