**Carol J. PETERSON, Plaintiff,**

v.

**Jo Anne B. BARNHART,[1] Commissioner of Social Security, Defendant.**

**No. CIV.A.00–488–SLR.**

United States District Court, D. Delaware.

Aug. 8, 2002.

---

1. Effective November 14, 2001, Jo Anne Barnhart became the Commissioner of Social

**440**

Security to succeed Acting Commissioner Larry G. Massanari, who succeeded Commissioner Kenneth S. Apfel. Pursuant to Fed. R.Civ.P. 25(d)(1) and 42 U.S.C. § 405(g), Jo Anne Barnhart is automatically substituted as the defendant in this action.

Angela Pinto Ross, Wilmington, DE, for Plaintiff.

Colm F. Connolly, United States Attorney and Virginia Gibson–Mason, Assistant United States Attorney, United States Attorney Office, Wilmington, DE (James A. Winn, of counsel), Heather A. Benderson, Assistant Regional Counsel, Social Security Administration, Philadelphia, PA, for defendant.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

### I. INTRODUCTION

Plaintiff Carol J. Peterson filed this action against Jo Anne Barnhart, Commissioner of Social Security ("Commissioner"), on May 16, 2000. (D.I.3) Plaintiff seeks judicial review after the Commissioner denied her claim for supplemental security income under Title XVI of the Social Security Act, or 42 U.S.C. §§ 1381–1383f. The court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Currently before the court are the parties' cross-motions for summary judgment. (D.I.14, 17) For the following reasons, the court shall grant defendant's motion and deny plaintiff's motion.

### II. BACKGROUND

#### A. Procedural History

On May 22, 1997, plaintiff filed an application for Supplemental Security Income ("SSI") due to memory problems, mobility restrictions, dizziness and visual impairment, alleging an onset date of March 29, 1997. (D.I. 10 at 18–20, 80) The application was denied both initially and upon reconsideration. Plaintiff then requested and subsequently received a hearing before an Administrative Law Judge ("ALJ"), which was held on September 17, 1998. (*Id.* at 16) On November 17, 1998, the ALJ issued a decision denying plain-

tiff's claim. After careful consideration of the entire record, the ALJ found the following:

1. Claimant has not engaged in substantial gainful activity since her filing date.

2. Claimant's status post CVA, non-insulin-dependent diabetes mellitus and adjustment disorder with depressed mood, and borderline intellectual functioning are "severe" impairments.

3. Claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. Claimant's statements concerning the nature and severity of her symptoms are not fully credible.

5. Claimant retains the residual functional capacity to perform the full range of light work, but limited in that she cannot climb ropes or scaffolds and can only occasionally balance, stoop, kneel, crouch, or crawl; must avoid hazardous machinery and is moderately impaired in her ability to: understand/remember detailed instructions; maintain attention and concentration for extended periods of time; sustain an ordinary routine without supervision; complete a normal workday without interruptions from psychologically-based symptoms; respond appropriately to changes in the work setting; travel in unfamiliar places to use public transportation; set realistic goals or make plans independently of others (20 CFR 416.945).

6. Claimant has no past relevant work history.

7. Claimant is 48 years old, which is defined as a "younger individual." (20 CFR 416.963).

8. Claimant has a 10th grade education, and thus has a "limited education." (20 CRF 416.964).

9. In light of claimant's age, education and work experience, it is not material whether or not she has any acquired work skills which are transferable to the skilled or semiskilled work functions of other work (20 CFR 416.968).

10. If claimant had the exertional capacity to perform a full range of light work and considering her age, education and work experience, section 416.969 of Regulations No. 16 and Rule 202.17, of Table No. 2, Appendix 2, Subpart P, Regulations No. 4, would direct a finding of "not disabled."

11. Although claimant's non-exertional limitations do not allow her to perform the full range of light work, using the above-cited rule as a framework for decisionmaking, there are a significant number of jobs in the national economy which she can perform, examples are assembler and sorter.

12. Claimant was not under a "disability," as defined by the Social Security Act, at any time through the date of this decision (20 CFR 416.920(f)).

(*Id.* at 20–22) The ALJ arrived at his decision that plaintiff did not meet any listing requirements by evaluating plaintiff's impairments under listings 12.04 (Affective Disorders) and 12.05 (Mental Retardation and Autism). (*Id.* at 18, 23) The ALJ noted that plaintiff met the diagnostic criteria listed under Part A of listing 12.04, but failed to satisfy any of the criteria listed under Part B. Under listing 12.05, the ALJ found that plaintiff's mental impairments did not meet any of the listed criteria. (*Id.* at 18) Additionally, the ALJ determined that plaintiff was not disabled because she retained work capacity to perform light work, with some non-exertional limitations, which allowed her to perform jobs as an assembler or sorter. (*Id.* at 20)

Plaintiff filed a timely request to the Appeals Council for review of the ALJ's decision, and this request was denied on February 24, 2000. (*Id.* at 6–8) Plaintiff now seeks review before this court.

## B. Facts Evinced at the ALJ Hearing

Plaintiff was born on December 17, 1949. (*Id.* at 79) She completed formal education through the tenth grade and has no past work experience, since she stays home to care for her children. (*Id.* at 18, 34–35)

At the hearing, plaintiff testified that since a stroke in March 1997, she has had problems walking and balancing, sometimes forgetting things, talks "funny", and has a hard time lifting and carrying things. (*Id.* at 36) She also testified that since the stroke she has not cooked, but tries to wash dishes, sweep the floor, and do the laundry. (*Id.* at 35, 39) Plaintiff claimed that she now gets frustrated when reading, sleeps two to three times a day for a couple of hours, sees things "mostly blurry," gets really "bad headaches" from using her eyes to focus on things or to read. (*Id.* at 42–43) In addition, plaintiff claimed that her current physician, Dr. Henry, as well has her past physicians Dr. Quashie and Dr. Schickler, all told her that she could not lift more than five pounds. (*Id.* at 36) Plaintiff testifies that she has been taking Glipizide for her diabetes mellitus, Lipitor to control her high blood pressure, eye drops for her glaucoma and aspirin, and that she is a cigarette smoker. (D.I.10) Plaintiff admits that she forgets to take her medications at times, which makes her feel "drunk," but that particular feeling reminds her to take the medications. (*Id.* at 37)

## C. Vocational Expert Testimony

At the hearing, the ALJ sought testimony of Beth Kelley, a vocational expert, in order to determine whether any jobs were available that plaintiff could perform. (*Id.* at 43) The ALJ asked Ms. Kelley to assume a hypothetical individual with plaintiff's vocational characteristics, who was limited to light work that did not require any climbing on ropes, scaffolding, or ladders; only occasionally balancing, stooping, kneeling, crouching, and crawling; and had no contact with hazardous machinery. (*Id.*) He asked Ms. Kelley to further assume that this individual was moderately impaired in her ability to understand and remember detailed instructions;[2] maintain attention and concentration for extended periods; sustain an ordinary routine without supervision; complete a normal work day without interruptions from psychologically-based symptoms; and respond appropriately to changes in work environment. (D.I. 10 at 43–44) Ms. Kelley then testified that such an individual could work as an assembler (approximately 3,000 in Delaware and 200,000 nationally), or as a sorter (approximately 500 in Delaware area, and 65,000 nationally). (*Id.* at 44)

The ALJ next asked the vocational expert to assume an individual with the same psychological impairments as the first, and further assume that she can lift up to five pounds very infrequently; do very little standing; only occasionally balancing, stooping, kneeling, crouching, and crawling; and walk up to 30 minutes a day. (*Id.*) Ms. Kelly testified that:

> The range of potential jobs is really eroded to where there's not going to be much of anything. Lifting five pounds very infrequently just that alone gets us into far less than the full range of seden-

2. The ALJ later agreed that plaintiff was assessed as markedly impaired in her ability to remember detailed instructions, but the voca-

tional expert testified that a marked impairment did not change her opinion on the type of jobs plaintiff could do. (D.I. 10 at 50).

tary work, it's very difficult to quantify standing and walking, also reduces sedentary to what could be up to two hours down to 30 minutes. There's really not going to be much of anything left... There are sedentary assembly jobs to the degree that— it's very difficult to say how many will allow for lifting up to five pounds frequently, there would be some. The figures— in my estimate based on experience on just that factor alone would erode sedentary assemblers by 50 to 75 percent... There might be approximately— there would be perhaps a few hundred in the Delaware area, it would still be several thousand nationally.

(D.I. 10 at 43–45)

### D. Medical History

On March 30, 1997, plaintiff went to the hospital emergency room approximately two weeks after suffering a stroke and was treated by John Chabalko, M.D. (*Id.* at 141) She exhibited facial drooping and weakness on the left side of her body and exhibited mildly slurred speech. Dr. Chabalko diagnosed plaintiff as having sustained a subacute right cerebrovascular accident ("CVA") and occlusion of the right internal carotid artery, with no progression of weakness. (*Id.*) He ordered a follow up with the hospital's family practice center to further classify the seriousness of the stenosis and prescribed Glucotrol and Ecotrin upon release. (D.I. 10 at 142) Dr. Chabalko also noted plaintiff had a history of diabetes, but "has not been on any medication and has not been seeing a physician on a regular basis." (*Id.* at 141).

Plaintiff received follow up treatment from April to October 1997 with Dawn Quashie, M.D. (*Id.* at 164, 166–69) At a May 1997 visit, plaintiff complained of memory problems, feeling tired all the time and some weakness in both legs. (*Id.* at 169) Dr. Quashie did not prescribe any additional medications that plaintiff was not already taking. However, she did place plaintiff on a dietetic diet. (*Id.* at 167) Dr. Quashie again noted plaintiff's tiredness on a June 24 visit, after plaintiff had suffered from the flu. (*Id.* at 167–68) She also reported that plaintiff denied any more tingling feelings, her gait was no longer disturbed, and that plaintiff was attempting to exercise. (*Id.* at 168) By September 1997, Dr. Quashie noted that plaintiff was complaining of tingling in her left forearm intermittently, but that the weakness in her legs had resolved. At an October 1997 visit, plaintiff did not complain of any weakness or pain. (*Id.* at 165–66) Additionally, Dr. Quashie referred plaintiff to William Schickler, M.D., P.A., a vascular disorder specialist, for further evaluation of the occluded right internal carotid artery. In a letter dated August 25, 1997, Dr. Schickler remarked that the stroke symptoms had resolved, although plaintiff still had slight problems with her speech and mild left arm weakness. (*Id.* at 202) He encouraged plaintiff to continue taking aspirin and to quit smoking. (*Id.* at 203)

On July 20, 1997, I.L. Lifrak, M.D. examined plaintiff at the request of the Commissioner. (*Id.* at 185) He noted that plaintiff had memory difficulties for both recent and remote events, exhibited a restricted range of motion in the upper left extremities, and had non-insulin dependant diabetes-mellitus. (*Id.* at 188) A musculoskeletal examination confirmed weakness in the upper left extremities, but the range of motion was still relatively close to normal. (*Id.* at 189–93)

Andrew M. Barrett, M.D. performed visual field tests on plaintiff on September 23, 1997. (*Id.* at 175) He diagnosed her with glaucoma and recommended treatment to Stanley Strauss, O.D., plaintiff's regular optometrist. (*Id.* at 175) Dr. Strauss reported plaintiff's vision as 20/20

with correction. (*Id.* at 173) He referred plaintiff to a specialist for further evaluation of her high intraocular pressures, but plaintiff failed to keep that appointment. (*Id.* at 173–174) It is unclear from the record whether further evaluations for her visual symptoms have been followed up.

On November 4, 1997, at the Commissioner's request, Frederick Kurz, Ph.D. performed a clinical psychological evaluation of plaintiff. (*Id.* at 188) Dr. Kurz administered a Wechsler Adult Intelligence Scale–Revised ("WAIS–R") Clinical Psychological Evaluation and a Wechsler Memory Scale test. (*Id.*) Plaintiff attained a Verbal IQ of 74, a Performance IQ of 78 and a Full Scale IQ of 75 on the WAIS–R, which put her within the borderline ranges of general cognitive functioning; she attained a memory quotient of 66, which placed her in the impaired ranges when compared to others of her same age. (D.I. 10 at 209–10) Plaintiff also had a Global Assessment of Function ("GAF") of 60.[3] (*Id.* at 210) Dr. Kurz diagnosed her with an adjustment reaction with depressed features, borderline intellectual functioning and impaired vocational skills.

A Psychiatric Review Technique form completed on November 5, 1997 indicated that plaintiff had no functional limitations that satisfied listings 12.04 and 12.05, but did note slight limitations in daily living activities, social functioning, and concentration deficiencies. (*Id.* at 213–221) A Mental Residual Functional Capacity Assessment stated that plaintiff functioned intellectually at the borderline ranges of general cognitive functioning, with slightly lower memory functioning, and could perform only simple tasks. (*Id.* at 224)

A completed Physical Residual Functional Capacity Assessment dated December 12, 1997 indicated that plaintiff had a mild limp in the lower left extremity, but diagnosed her as able to handle light, nonhazardous work activity. (*Id.* at 232)

Plaintiff began seeing George Henry, M.D. when she relocated from Delaware to Maryland in February 1998. (D.I. 10 at 238) Dr. Henry noted in their first visit, on February 27, 1998, that plaintiff complained of numbness of hands and legs and that she needed to be scheduled for a physical examination, but he did not prescribe any new medication to treat the complained of symptoms. (*Id.*) On June 26, 1998, plaintiff sought Dr. Henry for treatment of a rash, and the doctor noted that "[plaintiff] also claims that she feels better when she takes 2 Glipizides daily." (D.I. 10 at 237) Finally, on August 28, 1998, Dr. Henry completed a Medical Assessment of Ability to do Work-related Activities (Physical), where he opined that plaintiff's stroke affected her balance, led to a weakness of grip in the left hand, caused memory loss, restricted her ability to lift and carry only up to five pounds, and resulted in developing additional allergies and nervousness. (*Id.* at 240–42)

## III. STANDARD OF REVIEW

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive," and the court will set aside the Commissioner's denial of plaintiff's claim only if it is "unsupported by substantial evidence." 42 U.S.C. § 405(g); 5 U.S.C. § 706(2)(E) (1999); *see Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir.1986). As the Supreme Court has held,

> "substantial evidence is more than a mere scintilla. It means such relevant

---

**3.** According to the *Diagnostic and Statistical Manual of Mental Disorders (DSM–IV),* a GAF score of 51 to 60 indicates some moderate symptoms (e.g. flat affect and circumstantial speech) or moderate difficulty in social, occupational or school functioning. (D.I. 17 at 8, n. 1)

evidence as a reasonable mind might accept as adequate to support a conclusion." Accordingly, it "must do more than create a suspicion of the existence of the fact to be established.... It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

*Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (quoting *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939)).

The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Fed.R.Civ.P. 56:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> Petitioners suggest, and we agree, that this standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g),

> "[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervail-

ing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion."

*Brewster v. Heckler,* 786 F.2d 581, 584 (3d Cir.1986) (quoting *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir.1983)).

 "Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir.2000) (quoting *Smith v. Califano,* 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris,* 745 F.2d 210, 221 (3d Cir.1984).

## IV. DISCUSSION

### A. Standards for Determining Disability

In order to be eligible for SSI benefits, a person's income and financial resources must be below a certain level and he must be disabled. *See* 42 U.S.C. § 1382(a).

A person is considered disabled if he can demonstrate that he has some

> "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." A claimant is considered unable to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful

work which exists in the national economy".

*Plummer v. Apfel,* 186 F.3d 422, 427–428 (3d Cir.1999) (internal citations omitted). *See also Sullivan v. Zebley,* 493 U.S. 521, 524, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). The Social Security Administration has promulgated regulations by creating a five-step test to determine whether an adult claimant is disabled:

> The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits.

*Sullivan,* 493 U.S. at 525–526, 110 S.Ct. 885 (internal citations omitted).[4] Plaintiff bears the burden of proving she has a severe impairment and is incapable of performing any past relevant work. *See Sykes v. Apfel,* 228 F.3d 259, 263 (3d Cir. 2000). At step five, the burden of production shifts to the Commissioner, "who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability," and the ALJ will "often seek the assistance of a vocational expert at this fifth step." *Plummer,* 186 F.3d at 428.

For mental impairments, an additional regulatory process supplements the five-step test, which requires the ALJ to

> record the pertinent signs, symptoms, findings, functional limitations and effects of treatment contained in the case record, in order to determine if a mental impairment exists. If an impairment is found, the examiner must analyze whether certain medical findings relevant to a claimant's ability to work are present or absent. The examiner must then rate the degree of functional loss resulting from the impairment in certain areas deemed essential for work. [FN3] If the mental impairment is considered "severe," the examiner must then determine if it meets a listed mental disorder. If the impairment is severe, but does not reach the level of a listed disorder, then the examiner must conduct a residual functional capacity assessment. At all adjudicative levels, a Psychiatric Review Treatment Form ("PRT form") must be completed. This form outlines the steps of the mental health evaluation in determining the degree of functional loss suffered by the claimant.
>
> FN3. § [416.920a(c)(3) ][5] provides for the examination of the degree of functional loss in four areas of function considered essential to work. These areas of activities are: daily living; social functioning; concentration, persistence, or pace; and deterioration or decompensation in work or work-like

---

4. Although the cited case refers to disability benefits, the same five-step test also applies to SSI cases. *See Thomas v. Commissioner of Social Security,* 294 F.3d 568, 571 (3d Cir. 2002) (citing regulations 20 C.F.R. §§ 404.1520, 416.920 as the sequential disability determination process).

5. The original cite, 20 C.F.R. § 404.1520a(b)(3), only applies to those seeking disability benefits. This substitution is the SSI equivalent.

settings. The degree of functional loss is rated on a scale that ranges from no limitation to so severe the claimant cannot perform these work-related functions. This information is then detailed on a PRT form.

*Id.* at 428 (internal citations omitted).

### B. Application of Standards to Plaintiff's Claims

In the case at bar, the first step of the test is not at issue, since plaintiff has not engaged in substantial gainful activity since May 22, 1997. At step two, the ALJ determined that plaintiff's impairments were severe, since they significantly limit her ability to do basic work activities. (D.I. 10 at 18)

#### 1. Listing Determination

■ At step three of the disability evaluation process, the ALJ determines whether the claimant's impairment matches, or is equivalent to, one of the listed impairments in the applicable regulation, 20 C.F.R. pt. 404, Subpt. P, App. 1 (pt. A) (2001). *Burnett v. Commissioner of Social Security Administration,* 220 F.3d 112, 119 (3d Cir.2000). "If the impairment is equivalent to a listed impairment, then [the claimant] is *per se* disabled and no further analysis is necessary." *Id.* Plaintiff argues that the ALJ failed to consider listing 12.02 (organic mental disorders), as he did not discuss that listing in the body of his decision. (D.I. 10 at 14–16)

■ To meet a specific listing, plaintiff must show that all of the criteria of that listing are met. *Sullivan,* 493 U.S. at 530, 110 S.Ct. 885. Meeting some of the criteria "no matter how severely, does not qualify." (*Id.*) The listing at 12.02 requires that plaintiff either meets both parts A and B, or meets part C. *See* 20 C.F.R. § 404, Subpt. B, App. 1 (Listing 12.02); [6] 20 C.F.R. § 404.1525.[7]

6. The required level of severity for listing 12.02 are as follows:

A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
1. Disorientation to time and place; or
2. Memory impairment, either short-term, intermediate or long-term; or
3. Perceptual or thinking disturbances; or
4. Change in personality; or
5. Disturbance in mood; or
6. Emotional ability and impairment in impulse control; or
7. Loss of measured intellectual ability of at least 15 I.Q. points form pre-morbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing;
AND
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence or pace; or
4. Repeated episodes of decompensation, each of extended duration;
OR
C. Medically documented history of a chronic organic mental disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psycho social support and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of one or more years's inability to function outside a highly supportive living arrangement, with indication of continued need for such an arrangement.

7. The Listing of Impairments is the same for those applying for either disability benefits or for SSI.

■ Plaintiff argues that the ALJ failed to consider listing 12.02 at step three of the evaluation process, and "[t]he combination of borderline intellectual functioning and adjustment disorder would support that [plaintiff] has marked areas with respect to psychological functioning." (D.I. 15 at 16) Defendant counterargues that the ALJ did consider listing 12.02 and found no facts to prompt further examination of that listing, citing the Psychiatric Review Technique Form ("PRTF") attached to the ALJ's opinion. (D.I. 17 at 20) Defendant points out that plaintiff's examining physicians never diagnosed her with an organic mental disorder.[8] Also, Dr. Kurz reported that it was not possible to pinpoint whether plaintiff's stroke had any impact on her cognitive skills, since she had not been tested before, thus making it impossible to show a deterioration in cognitive function. (D.I. 10 at 210) Even if plaintiff's memory impairment were to satisfy Part A, the evidence shows that her limitations were only slight to moderate, never "marked," as required by Part B. At most, Dr. Kurz opined that plaintiff had only moderate difficulty in social and occupational functioning. (*Id.*) Based on the evidence, the court concludes that the ALJ correctly found that she did not meet this listing.

## 2. Residual Functional Capacity Determination

Plaintiff also asserts that the ALJ's step five findings with regard to residual functional capacity did not take into consideration all of the medical evidence, did not take her subjective complaints into consideration, and improperly rejected Dr. Henry's assessments of her impairments. Plaintiff further argues that defendant failed to demonstrate that work is available in the national economy which plaintiff can perform. (D.I.15)

In determining whether plaintiff is disabled, the ALJ must have considered "all [plaintiff's] symptoms, including pain, and the extent to which [plaintiff's] symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence... However, statements about [plaintiff's] pain or other symptoms will not alone established that [plaintiff's] disabled." 20 C.F.R. 416.929(a). These regulations also require (1) objective evidence of a medically determinable impairment that could reasonably be expected to produce the symptoms alleged, followed by (2) an evaluation of the pain or symptoms and the extent to which it affects the individual's ability to work. 20 C.F.R. § 416.929(b). The opinion of a treating physician as to the nature and severity of an impairment is entitled to controlling weight only if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and does not conflict with other substantial evidence. 20 C.F.R. § 416.927(d)(2).

■ After reviewing the medical records and other evidence of record, the court agrees with defendant that substantial evidence exists to support the ALJ's determination that plaintiff was capable of light work with some exertional and nonexertional limitations.[9] The objective med-

---

**8.** Organic Mental Disorder is defined as "Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." 20 C.F.R. § 404, Subpt. P, App. 1, listing 12.02.

**9.** Although the court finds that substantial evidence supports ALJ's ultimate decision, the court agrees with plaintiff that the ALJ's opinion fails to explicitly discuss all the relevant objective medical evidence. Nevertheless, the omissions do not appear to strongly favor plaintiff and, therefore, do not warrant remand to the ALJ for further explanation.

ical record demonstrates a lack of long-term debilitating effects from the stroke. Although plaintiff experienced a mild limp, numbness in her extremities and slurred speech after her stroke, these symptoms were mostly resolved by late August 1997. The only treatment prescribed during that period was for her to take aspirin and to stop smoking. Dr. Chabalko noted that her echocardiogram result was normal, a speech therapist recommended no additional treatment, and plaintiff's physical therapy results were also normal. (D.I. 10 at 142, 160) When plaintiff received follow-up treatment with Dr. Quashie, she repeatedly complained of some fatigue, weakness and memory problems. The only additional treatment prescribed by Dr. Quashie was to address plaintiff's cholesterol levels and diabetes mellitus. Plaintiff even claimed an attempt to exercise. (Id. at 164–169) Dr. Schickler reported in August 1997 that plaintiff had only mild left arm weakness, otherwise her stroke symptoms had resolved. (Id. at 202) Dr. Barrett diagnosed plaintiff with glaucoma, which supports plaintiff's complaints of blurry vision, but this condition was controllable through eye drops. (Id. at 37, 175) By November 1997, Dr. Lifrak determined that plaintiff was in "no acute physical distress who ambulates without the aid of any assistive device, able to get on and off the examining table without assistance," and "able to perform maneuvers of the hands requiring dexterity... without difficulty." (Id. at 186) In the same examination, plaintiff's grip strength, muscle tone and sensation were normal, and her only impairment was that she could not recall recent and remote events. (Id. at 188) Dr. Henry noted in June 1998 that plaintiff admitted to feeling better when she took her diabetes medication. (Id. at 237)

The objective medical evidence also shows only moderate psychological problems. Although at his November 1997 ex-amination of plaintiff, Dr. Kurz noted that her memory was "somewhat defective," his diagnosis classified plaintiff as someone who functions within "the borderline ranges in general cognitive functioning and within the mildly impaired ranges in short term memory." (Id. at 210) Plaintiff's speech was coherent with relevant content, she had fair common sense, good impulse control, fair judgment, and fair intellectual and emotional insight. (Id. at 209–210) Dr. Kurz was unable to compare plaintiff's cognitive abilities to her abilities before the stroke because plaintiff had not previously been tested. (Id. at 210) The state agency's psychological assessment concluded plaintiff was capable of performing simple tasks. (Id. at 224)

■ Plaintiff complains that the ALJ gave insufficient consideration to her subjective complaints. The ALJ did consider her testimony, but concluded the severity alleged by plaintiff was not supported by objective medical evidence. Although plaintiff clearly has memory impairments and exhibits a mild gait in her lower left extremities, plaintiff testified that she still helps with grocery shopping, as well as performs certain chores around the house without assistance. (Id. at 39, 129) As reviewed earlier, any physical or psychological symptoms experienced by plaintiff were mild or moderate in the opinion of the examining physicians, and no extensive treatment was ever recommended. Based on the above, the ALJ properly found that plaintiff's subjective complaints were not fully credible.

■ Plaintiff also alleges that Dr. Henry's assessments of her residual capacity, in 1998, were incorrectly dismissed "because he was not a specialist," and that the "ALJ completely ignored medical evidence in the record that would support [plaintiff's] statements about her impairments." (D.I. 15 at 12, 19) Furthermore, plaintiff

claims that the ALJ improperly relied only upon the opinions of the non-examining physicians. (*Id.* at 20) The ALJ indicated that Dr. Henry's assessment was dismissed not only because he was not a specialist in disability evaluations, but because "[plaintiff's] complaints of weakness and forgetfulness have not been confirmed by objective neurological testing." (D.I. 10 at 19) There is nothing in the record showing objective medical testing of plaintiff's physical capabilities by Dr. Henry to support his conclusions. Dr. Henry had only treated plaintiff for a limited time, further undermining plaintiff's claims that his opinion should have controlling weight. In addition, in making his disability determination, the ALJ relied not only upon the non-examining state agency physicians' assessments, but also on examining physicians, such as Dr. Lifrak and Dr. Kurz. (*Id.* at 19) The assessments and examination of these examining and non-examining physicians all support the ALJ's findings as to plaintiff's limitations and Residual Functional Capacity. *See* 20 C.F.R. § 416.927(d)(3)-(4). The court agrees with the ALJ's determination that Dr. Henry's assessment of plaintiff's lifting capacity was not consistent with the other evidence of record, and not deserving of controlling weight.

Plaintiff next argues that the ALJ's hypothetical to the vocational expert did not take into account all her mental and physical impairments and, therefore, defendant did not satisfy the burden to show available jobs based on plaintiff's residual functional capacity. (D.I. 15 at 22) As discussed earlier, the court finds that substantial evidence supports the ALJ's determination of light work with certain stated limitations. During plaintiff's cross-examination of the vocational expert, Ms. Kelley was asked to clarify a hypothetical where an individual had "a marked impairment of ability to carry out detailed job instructions or could lift only five pounds infre-

quently." (*Id.* at 50) The vocational expert testified that

> simple assembly jobs don't have detailed job instructions they're verbally ... Like I said, there would be a limited range of hand production work light assembly and that—- was where I indicated it may be up to 50 percent, or 50 to 75 percent of the range of looking at the sedentary—- because it's limited to five pounds so it does greatly reduce the potential number of sedentary jobs with all the other factors being equal ... There still would be a few hundred in the Delaware area, a few thousand nationally.

(*Id.* at 50–51)

■ In sum, the court concludes that substantial evidence of record supports the ALJ's determination that plaintiff can perform light work with some exertional and non-exertional limitations, and that a significant number of jobs exists in the national economy which plaintiff could perform. Thus, the court affirms the Commissioner's decision that plaintiff is not disabled.

## V. CONCLUSION

For the reasons stated, the court shall grant defendant's motion for summary judgment and deny plaintiff's motion for summary judgment. An appropriate order shall issue.

## ORDER

At Wilmington, this 8th day of August, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that:

1. Defendant's motion for summary judgment (D.I.17) is granted.

2. Plaintiff's motion for summary judgment (D.I.15) is denied.

3. The Clerk of Court is directed to enter judgment in favor of defendant and against plaintiff.

4. The Clerk of Court is directed to substitute Jo Anne B. Barnhart, Commissioner of Social Security, as defendant in this action pursuant to Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. § 405(g).