**Michele ROBISON, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

No. CIV.03–539–SLR.

United States District Court, D. Delaware.

May 3, 2004.

Angela Pinto Ross, Esquire, Wilmington, DE, for Plaintiff.

Colm F. Connolly, United States Attorney, Douglas E. McCann, Assistant United States Attorney, United States Attorney's Office, Wilmington, DE, for Defendant. Of Counsel: James A. Winn, Regional Chief Counsel, Taryn F. Goldstein, Assistant Regional Counsel, Social Security Administration, Philadelphia, PA.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

Plaintiff Michele Robison filed this action against defendant Jo Anne Barnhart, Commissioner of Social Security ("Commissioner"), on June 4, 2003. (D.I.1) Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision by the Commissioner denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–433. Currently before the court are the parties' cross-motions for summary judgment. (D.I.21, 23) For the following reasons, the court denies plaintiff's motion and grants the Commissioner's motion.

1. The ALJ is permitted to ask a claimant to undergo a consultative examination if the information needed to evaluate claimant's application is not readily available from her

## II. BACKGROUND

### A. Procedural History

On July 7, 1999, plaintiff filed an application for DIB. (D.I. 6 at 101–103) Plaintiff alleged that she was disabled and unable to work as of March 3, 1998 due to diabetes mellitus, hypertension, gastroesophageal reflux disease, endometriosis, hypothyroidism, and depression. (*Id.* at 15) The State denied plaintiff's original application on August 19, 1999 and her application on reconsideration on December 1, 1999.

Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 86–88) On September 14, 2000, the ALJ conducted a hearing where plaintiff and an independent vocational expert testified. (*Id.* at 30–34, 35–69) Following this hearing, the ALJ requested psychiatric and physical consultative examinations for plaintiff.[1] These examination were performed in October 2000 by Dr. Peeyush Mittal, M.D., and Dr. Prudenci Rosas, M.D.. Dr. Mittal evaluated plaintiff's mental state, and Dr. Rosas focused on plaintiff's physical health. On August 17, 2001, the ALJ issued a decision denying plaintiff's claim. (*Id.* at 11–23) In considering the entire record, the ALJ found the following:

1. The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

medical records or the ALJ is unable to seek clarification from claimant's medical source. 20 C.F.R. § 404.1512(f).

3. The claimant's diabetes mellitus, hypertension, endometriosis, gastroesophageal reflux disease and hypothyroidism are considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The ALJ finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The ALJ has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7. Claimant has the residual functional capacity to perform sedentary work with sit/stand option.

8. Claimant is unable to perform any of her past relevant work (20. CFR § 404.1565).

9. Claimant is a "younger individual" (20 CFR 404.1563).

10. Claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

11. Claimant has the residual functional capacity to perform a restricted range of sedentary work. (20 CFR § 404.1567).

12. Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical–Vocational Rule 201.27 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a final assembler (400 jobs locally and 76,000 nationally), and a surveillance system monitor (300 jobs locally and 78,000 nationally) which is a representative sample.

13. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision. (20 CFR § 404.1520(f))

(*Id.* at 22–23) In making these findings, the ALJ reviewed the plaintiff's medical records from 1998 through 2000, including the requested psychiatric and physical consultative examinations. The ALJ denied plaintiff's claim for DIB under Sections 216(I) and 223 of the Social Security Act. (*Id.* at 23)

On August 23, 2001, plaintiff appealed the ALJ's decision. The Appeals Council denied plaintiff's request for review on March 14, 2002. (*Id.* at 7) As a result, the ALJ's decision became the final decision of the Commissioner under 20 C.F.R. § 404.981. Plaintiff now seeks review before this court pursuant to 42 U.S.C. § 405(g).

**B. Facts Evinced at the Administrative Law Hearing**

At the time of the ALJ hearing in 2000, plaintiff was a thirty year old female with a high school education. (*Id.* at 15) Plaintiff alleges that her disability began on March 3, 1998. (*Id.*) Her past work experience includes employment as a bus driver, house cleaner, and cashier. (*Id.*) She currently lives with her husband and niece in a mobile home. (*Id.* at 19) Plaintiff testified that her daily activities include getting her niece up for school, dressing her, and then taking her to school. (*Id.* at 16) She also testified that she cooks, washes dishes, does crossword puzzles, reads, helps her niece with her homework,

straightens up the house, takes her medication, and watches television. (*Id.* at 16, 19) Plaintiff further testified that she gets along with her family members, goes to doctors' appointments, and goes shopping. (*Id.*)

Regarding plaintiff's medical condition, plaintiff testified that she has diabetes, hypertension, and endometriosis. (*Id.* at 43, 55) Plaintiff testified that the low blood sugar that results from her diabetes causes her to experience tingling and numbness in both of her hands and legs, cramps in her toes, and fluid build-up or swelling in her extremities. (*Id.* at 47) Plaintiff also stated that she usually has to lie down for one to two hours a day, four or five days a week. (*Id.* at 56) In addition, plaintiff claimed that she suffers pain in her stomach due to endometriosis. (*Id.* at 48)

Plaintiff testified that she medicates with a variety of prescriptions. (*Id.* at 57–62) She explained that she takes Docuset, Propantalene, and Protanex for her gastroesophageal reflux disease, ulcers, bowels, and other stomach problems. (*Id.*) She also testified that she takes Demodex and Acuprill for her high blood pressure. (*Id.*) In addition, she stated that she takes Cloricon for potassium, Trichlor for high cholesterol, Topol and Avandia for sugar, Buspar for anxiety, Midrin for tension headaches, Darvoset for pain, Proclarbenzeprene for nausea, Vioxx for dysmenorrhea, Clymiacin for teeth infections, Nauvolin and Humolog for blood sugars, and Zeroxalin for swelling. (*Id.*) Plaintiff stated that she has experienced side-effects such as tiredness, dizziness, occasional headaches, and chest pains from her medications. She likewise stated that her medications give her constant abdominal pain and cause her to experience frequent nausea, urination, and bowel movements. (*Id.* at 62–63)

## C. Vocational Evidence

During the administrative hearing, the ALJ called Robert Lester ("Lester"), a vocational expert, to testify about the exertional and skill requirements of plaintiff's prior job. (*Id.* at 64) Lester explained that plaintiff's past work as a bus driver qualifies as medium duty, semi-skilled. (*Id.* at 64, 65) In contrast, he testified that her work as a cleaner is considered as light duty and unskilled and her work as a cashier classifies as light duty and semi-skilled. (*Id.* at 65) The ALJ asked the following hypothetical question:

> Assume if you would, please an individual who is 29 years of age, twelfth grade education. Her past work experience as a bus driver, house cleaner and cashier. Utilizing Exhibits 1 through 26f as a guideline for limitations. We have in Exhibit 22f some (INAUDIBLE) said the individual had the capacity to carry up to 20 pound [sic] occasionally, to walk, sit or stand up to six out of eight hours each, with proper work breaks. This individual should avoid more than occasional bending, stooping, crouching, climbing. Are there any jobs such an individual could perform?

(*Id.*) Lester responded that light, unskilled work was available for such a hypothetical person including jobs as a small products assembler (76,000 jobs in the national economy and 650 jobs in the local economy); sales attendant (196,000 jobs in the national economy and 1,400 jobs in the local economy); information clerk (87,000 jobs in the national economy and 4,300 jobs in the local economy); and light, unskilled cashier II (300,000 jobs in the national economy and 600 jobs in the local economy). (*Id.* at 65, 66) The ALJ then asked the following second hypothetical question:

Assume an individual who is 29 years of age, twelfth grade education, who has the past work experience as a bus driver, house cleaner and cashier. And again utilizing exhibits 1f through 26f as a guideline to limitations, with emphasis on 23f. Assume that this individual has the capacity to lift up to 10 pounds occasionally, walk or stand up to four out of eight hours, sit up to six out of eight hours. Walking and standing limited to 30 minutes at a time. Sitting limited to an hour at a time, which invokes the limitations the individual should be able to alternate sitting and standing approximately 30 to 60 minute intervals. And that this individual should avoid again, more than occasional bending, stooping, crouching and climbing. Are there jobs that this individual could perform?

(*Id.*) Lester replied that such a hypothetical person could perform sedentary, unskilled work such as a final assembler (76,000 jobs in the national economy and 400 jobs in the local economy) or a surveillance system monitor (78,000 jobs in the national economy and 300 jobs in the local economy). (*Id.* at 66, 67)

### D. Medical Evidence

On April 30, 1998, Dr. Gary M. Piekarex, M.D., reported that plaintiff complained of headaches, vomiting, and diarrhea after running out of medication. (*Id.* at 237) Dr. Piekarex prescribed Glucophage and Glyburide.

On July 9, 1998, Dr. Piekarex performed a pelvic ultrasound on plaintiff at Bayhealth Medical Center, Inc.. This test revealed normal pelvic activity. (*Id.* at 246) Shortly thereafter, on July 12, 1998, Dr. Robert Hill, M.D., administered an abdominal screening, called an Acute Abdominal Series, on plaintiff. This test did not reveal any acute findings. (*Id.* at 248)

On September 28, 1998, Dr. Jack L. Snitzer, D.O., reported that plaintiff complained of numbness in her feet, frontal headaches, occasional left mid-sternal chest pain, and occasional black diarrhea, nausea, and vomiting. (*Id.* at 270, 271) Upon examination, Dr. Snitzer found that plaintiff's blood pressure measured 124/88 and that she was 66 inches tall and weighed 190 pounds. (*Id.*) Dr. Snitzer also found that plaintiff's thyroid was normal, her heart beat was regular, her lungs were clear, and her extremities had good pulses. (*Id.*) He further found no signs of edema and observed that she suffered from mild hirsutism on her chin and mustache area. (*Id.*) Upon examining plaintiff's agility, Dr. Snitzer noted that her straight leg raising was negative, her Achilles reflexes were diminished, and her vibratory sensation in her right big toe was decreased. (*Id.*) Dr. Snitzer concluded that plaintiff suffered from Type II diabetes mellitus, probable polycystic ovarian syndrome, and numbness of the lower extremities; he ruled out gastrointestinal disease. (*Id.*)

On October 31, 1998, plaintiff went to the Nanticoke Memorial Hospital emergency room complaining of lower abdominal and pelvic pain due to diarrhea. (*Id.* at 253) Upon examination, Dr. David C. Stair, M.D., found her temperature, pulse, and respiration to be normal. (*Id.*) Dr. Stair noted that her blood pressure was 142/90 and that plaintiff was in significant distress. (*Id.*) He performed an abdominal examination and concluded that plaintiff had positive bowel sounds. (*Id.*) Plaintiff refused a complete pelvic examination and left the hospital against Dr. Stair's advice. (*Id.*)

On February 25, 1999, Dr. Patrick Tierno, M.D., performed laparoscopic dilation and curettage procedures on plaintiff at Nanticoke Memorial Hospital pursuant to plaintiff's complaints of chronic pelvic pain.

(*Id.* at 259) Dr. Tierno concluded in his post-operative diagnosis that plaintiff continued to have chronic pelvic pain and menometrorrhagia, but that the latter was secondary to endometriosis and a cystic left ovary. (*Id.*)

On May 2, 1999, Dr. Khalil Gorgui, M.D., examined plaintiff at Nanticoke Memorial Hospital due to complaints of weakness, fatigue, nausea, and vomiting that had continued for several days. (*Id.* at 163) Upon examination, Dr. Gorgui reported that plaintiff had a cough and that her sugar level was in the mid 400s. (*Id.*) He found that plaintiff experienced generalized abdominal tenderness with deep palpation. (*Id.*) He noted that plaintiff had positive bowel sounds with no rebound, guarding, or organomegaly and that plaintiff's pulses were positive. (*Id.*) He likewise found that her extremities revealed no clubbing, cyanosis, or edema. (*Id.*) Dr. Gorgui concluded that a viral syndrome had caused plaintiff's diabetes mellitus to worsen. (*Id.* at 292, 293) He started plaintiff on insulin which eliminated her nausea and vomiting and reduced her sugar levels to the mid–200s. (*Id.* at 166)

On July 7, 1999, Dr. Gorgui performed a cardiac stress test on plaintiff at Nanticoke Memorial Hospital. (*Id.* at 308) As part of the test, plaintiff was required to exercise. After 5 minutes and 38 seconds, plaintiff complained of fatigue and chest pressure. Dr. Gorgui terminated the test due plaintiff's complaints. (*Id.*)

On July 27, 1999, Donald T. Laurion, D.O., examined plaintiff and reported his findings to Dr. Gorgui. (*Id.* at 309–311) Dr. Laurion found plaintiff to be mildly obese, but in no distress. (*Id.*) He noted that her blood pressure was 120/90 in her left arm and 130/100 in her right arm and that she weighed 200 pounds. (*Id.*) He found that her heart had a regular rate and rhythm with no S3, S4 click or rub.

(*Id.*) Dr. Laurion also noted that plaintiff's extremities had no clubbing, cyanosis, or edema. (*Id.*) He performed an electrocardiogram which demonstrated normal sinus rhythm and otherwise was within normal limits. (*Id.*) Dr. Laurion concluded that plaintiff suffered from chest pain, usually atypical, chronic hypertension, insulin dependent diabetes mellitus, and hypercholesterolemia. (*Id.*)

On July 28, 1999, Dr. Laurion and Dr. Gorgui performed a Dobutamine stress echo test on plaintiff at Nanticoke Memorial Hospital. (*Id.* at 307) Both doctors concluded that the test was unremarkable for Dobutamine stress echo or ischemia on clinical, electrocardiographic, and echo cardiographic grounds. (*Id.*)

On October 5, 1999, plaintiff returned to see Dr. Laurion for a cardiac follow-up visit. (*Id.* at 314) She complained of left shoulder pain associated with anxiety. She stated that she experienced mild dyspnea, but was significantly better since she stopped smoking six months ago. (*Id.*) Plaintiff also indicated that her blood sugars had been uncontrolled and that she had started on a 2000 ADA diet. (*Id.*) Upon examination, Dr. Laurion noted that plaintiff's blood pressure was 160/100 while sitting and 140/110 while standing and that she weighed 203 pounds. (*Id.*) He found that her heart was regular and that her lungs were clear. (*Id.*) He detected no peripheral edema or cyanosis. (*Id.*) Dr. Laurion performed an electrocardiogram which showed plaintiff's sinus tachycardia to be at 102 beats per minute and within normal limits. (*Id.*) Dr. Laurion concluded that plaintiff had resolved atypical chest pain, uncontrolled chronic hypertension, insulin dependent diabetes mellitus, and hypercholesterolemia. (*Id.*) He urged plaintiff to maintain her diet and perform aerobic exercises. (*Id.*)

On July 5, 2000, Dr. Snitzer completed a Medical Assessment of Ability to do Work–Related Activities. (*Id.* at 339–342) In this report, he indicated that the plaintiff is able to lift and carry up to ten pounds, stand and walk for four hours or less, thirty minutes at a time, and sit for four hours or less, for one hour at a time. (*Id.*) He also concluded that plaintiff can occasionally climb, balance, stoop, kneel, crouch, but not crawl. (*Id.*) Additionally, Dr. Snitzer indicated that plaintiff's impairments impacted her ability to reach, handle, feel, push/pull, see, and hear. (*Id.*)

On October 25, 2000, Dr. Mittal performed a psychiatric consultative examination on plaintiff. Plaintiff gave a history of recurrent depression and indicated that she had attempted to overdose on two occasions at the age of 16. (*Id.* at 352 – 354) She described herself as depressed and moody with increased anxiety and nervousness. (*Id.*) Dr. Mittal also noted that plaintiff alleged poor energy, fatigue, and decreased sleep. (*Id.*) Dr. Mittal performed a mental status examination on plaintiff and concluded that she was dressed appropriately, her speech was fluent, and she was alert and oriented to time, place, and person. (*Id.*) He further noted that she was able to perform concentration and calculation tests. (*Id.*) He found no signs of delusions, hallucinations, suicidal or homicidal ideation, or thought abnormalities. (*Id.*) Dr. Mittal concluded that plaintiff suffered from major depression, which was recurrent but mild. (*Id.*) Nonetheless, Dr. Mittal opined that plaintiff should be able to work from a psychiatric standpoint. (*Id.*)

On October 26, 2000, Dr. Rosas performed a physical consultative examination on plaintiff during which plaintiff provided a history of her medical problems. (*Id.* at 356–358) Upon examination, Dr. Rosas noted that plaintiff was moderately over-weight and pleasant with a very flat affect. (*Id.*) He reported that she weighed 226.5 pounds and that her height was 67 inches. (*Id.*) He found her blood pressure to be 130/84 and observed that her thyroid was not prominently noticeable or palpable. (*Id.*) He also noted that her lungs were clear and her heart had a regular sinus rhythm with no murmur, click, or rub. (*Id.*) Dr. Rosas examined plaintiff's abdomen and found it to be soft and non-tender. He did not detect any organomegaly or palpable masses, but identified some vague midepigastric tenderness. (*Id.*) He observed that plaintiff's extremities had no gross deformity, although showed minimal edema in her fingers. He further observed that plaintiff's ankles were not tender and that her legs did not show significant leg varicosities. He only noted a small bilateral venous capillary with no remarkable sensory deficits. (*Id.*) Dr. Rosas completed a Medical Assessment of Ability to do Work–Related Activities Physical and opined that plaintiff's impairments did not affect her ability to lift, carry, or sit. (*Id.* at 359–361) He indicated that standing and walking were limited to two hours in an eight hour work day. He further indicated that plaintiff could frequently balance, but only occasionally climb, stoop, crouch, kneel, and crawl. (*Id.*) Dr. Rosas concluded that plaintiff's impairments did not affect her manipulative ability and recommended that plaintiff avoid moving machinery, temperature extremes, and noise. (*Id.*)

## III. STANDARD OF REVIEW

■ "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive." 42 U.S.C. § 405(g). The court will set aside the Commissioner's denial of plaintiff's claim only if it is "unsupported by substantial evidence." 5 U.S.C.

§ 706(2)(E). The Supreme Court has held that

"substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Accordingly, it "must do more than create a suspicion of the existence of the fact to be established.... It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939)).

The Supreme Court also has embraced this standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56.

The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g),

"[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion."

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir.1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)).

■ "Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir.2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir.1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir.1984).

## IV. DISCUSSION

### A. Standards for Determining Disability

"Disability" is defined in the Social Security Act as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act also specifies that a person must "not only [be] unable to do his previous work but [must be unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). The Commissioner makes this determination based upon the regulations promulgated by the Social Security

Administration that set out a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920. The Third Circuit concisely outlined this process in *Plummer v. Apfel,* 186 F.3d 422 (3d Cir.1999).

In order to establish a disability under the Social Security Act, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." A claimant is considered unable to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."

The Social Security Administration has promulgated regulations incorporating a sequential evaluation process for determining whether a claimant is under a disability. In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. If a claimant is found to be engaged in substantial activity, the disability claim will be denied. In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work.

If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.

*Id.* at 427–28 (internal citations omitted).

## B. Application of the Five–Step Test

In the present case, the court notes that steps one, three, and four of the five-step test to determine whether a person is disabled are not in contention: (1) the ALJ determined that plaintiff has not engaged in substantial gainful activity since the alleged onset of her disability of March 3, 1998; (2) the ALJ concluded that plaintiff's physical impairments, despite qualifying as "severe," do not meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 so as to preclude any gainful work; and (3) the ALJ determined that plaintiff cannot return to her past relevant work. Plaintiff argues that the ALJ did not make any findings concerning whether her mental condition qualified as a severe impairment

under step two of the process.[2] Plaintiff also contests the ALJ's finding regarding step five of the process, namely, that she is capable of performing work as an assembler or surveillance system monitor. Plaintiff asserts that the ALJ made this decision based upon the hypotheticals posed to the vocational expert during the hearing, all the while knowing that said hypotheticals did not take into account her true mental and physical conditions uncovered during the post-hearing consultative examinations. Plaintiff likewise asserts that the hypotheticals should have included mental limitations to realistically evaluate her work capabilities. As a result of these deficiencies, plaintiff advocates that the ALJ should reopen the hearing pursuant to 20 C.F.R. § 404.944 to receive new and material evidence concerning her true mental and physical impairments.

■ Plaintiff's arguments are not persuasive. As to step two, the ALJ addressed plaintiff's mental condition in his decision, contrary to plaintiff's assertion. The ALJ specifically found that plaintiff "suffer[s] from mild, recurrent major depression which is non-severe." (D.I. 6 at 16) The court finds that the ALJ reached this conclusion based upon substantial evidence. An impairment is severe if it significantly limits an individual's physical or mental ability to perform basic work activities. *See* 20 C.F.R. § 404.1512(a). Plaintiff never complained of any mental problems prior to the psychiatric consultative evaluation in October 2000. Nevertheless, plaintiff testified only one month earlier at the hearing held in September 2000 that she engages in a variety of normal daily activities, including cooking, washing dishes, helping her niece prepare for school and complete homework assignments, and shopping. As well, during her

psychiatric consultative examination, plaintiff was dressed appropriately, spoke fluently, and was alert and orientated. Dr. Mittal even opined that plaintiff should be able to work from a psychiatric standpoint, since her depression was mild in intensity. Given plaintiff's ability to complete regular household chores and her apparent cognitive functioning, the court concurs that the ALJ properly assessed plaintiff's mental state as non-severe.

■ Regarding step five, the court finds that the ALJ's decision not to reopen the hearing following the consultative examinations was reasonable. "[T]he administrative law judge may . . . reopen the hearing at any time . . . in order to receive new and material evidence." 20 C.F.R. § 404.944. Dr. Rosas's physical consultative examination did not reveal any significant ailments not already in evidence at the time of the hearing. It likewise was consistent with the findings of the medical professionals who treated plaintiff prior to October 2000. Thus, the court finds that there was no new evidence to necessitate reopening the hearing.

Additionally, the court finds that the limitations included by the ALJ in his two hypotheticals posed at the hearing sufficiently captured the full scope of plaintiff's impairments. To this end, the first hypothetical accounted for an individual who could occasionally carry up to twenty pounds and walk, sit, or stand up to six out of eight hours each day with proper work breaks and who should avoid more than occasional bending, stooping, crouching, and climbing. The second hypothetical accounted for an individual who could occasionally lift up to ten pounds, walk or stand up to four out of eight hours, and sit up to six out of eight hours and who should

2. The ALJ only qualified plaintiff's diabetes mellitus, high blood pressure, endometriosis, gastroesophageal reflux disease, and hypothyroidism as "severe."

avoid more than occasional bending, stooping, crouching, and climbing. In his physical consultative examination report, Dr. Rosas opined that plaintiff's ailments did not limit her ability to lift, carry, or sit. He further indicated that plaintiff was limited to standing and walking for two out of eight hours and that she could only occasionally climb, stoop, crouch, kneel, and crawl. Thus, counter to plaintiff's assertions, the court concludes that there were no additional physical limitations to add to the hypotheticals to warrant reopening the hearing.

Moreover, the court finds that the ALJ need not reopen the hearing to amend his hypotheticals to include any mental impairment limitation. Steps three, four, and five of the five-step sequential evaluation only consider impairments that qualify as "severe." The ALJ, however, concluded that plaintiff's depression was a non-severe mental impairment. Consequently, the Regulations actually prohibit the ALJ from including plaintiff's non-severe mental state as a limitation in the hypothetical. Accordingly, the court finds that the ALJ based his decision that plaintiff could perform sedentary work upon substantial evidence and that the ALJ exercised reasonable discretion in not reopening the hearing. The court denies plaintiff's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment.

## V. CONCLUSION

For the reasons stated, the court denies plaintiff's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment. An appropriate order shall issue.

## ORDER

At Wilmington this 3d day of May, 2004, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that:

1. Plaintiff's motion for summary judgment (D.I.21) is denied.

2. The Commissioner's cross-motion for summary judgment (D.I.23) is granted.

3. The Clerk of Court is directed to enter judgment in favor of the defendant and against the plaintiff.